# EXHIBIT 3

D'MARCO CRAFT, AND
MICHAELE JACKSON,

PLAINTIFFS,

V.

RICHARD BILLINGSLEA,
HAKEEM J. PATTERSON, YOSSIF MANA,
ANTOINE HILL, GLENN BINES, DAVID MAYS, II,
NAIM BROWN, MICHAEL BAILEY, RANDALL CRAIG,
BRYAN MOORE, AND
THE CITY OF DETROIT, A POLITICAL SUBDIVISION
OF THE STATE OF MICHIGAN,

DEFENDANTS.


IN THE
UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CASE NUMBER: 2:17-CV-12752-GAD-MKM


RULE 26(a) REPORT OF STEVEN D. ASHLEY

AUGUST 22, 2019

# TABLE OF CONTENTS

NOTE: IN THE ELECTRONIC VERSION, CLICK TOC IN THE FOOTER OF EACH PAGE TO LINK BACK TO THIS TABLE OF CONTENTS
PRESSING YOUR "HOME" KEY WILL RETURN YOU TO THE COVER PAGE

*Provisos*.................................................................................................................*iv*

1. **Declaration of Steven D. Ashley**.................................................................... 1

2. **Introductory Statements**................................................................................ 2

   *Not Legal Advice or the Practice of Law* .......................................................... 2
   *Report Focus* .................................................................................................... 2
   *Case Specific Limitation*................................................................................... 2
   *Expert Capacity*................................................................................................ 2
   *Right to Amend* ................................................................................................ 2
   *Further Development* ........................................................................................ 2
   *Specific References*........................................................................................... 2
   *Newly Identified Issues*..................................................................................... 2
   *Degree of Certainty*.......................................................................................... 2
   *Discussions and Explanations of Underlying Issues* ........................................ 2
   *Credibility Determinations* ............................................................................... 2

3. **Executive Summary.**........................................................................................ 3

   Incident Synopsis ............................................................................................... 3
   Opinions in Brief................................................................................................ 3

4. **Expert Qualifications.**..................................................................................... 4

   Introduction to Qualifications. .......................................................................... 4
   Credentials in Brief. .......................................................................................... 4
   *Formal Education.* ............................................................................................ 5
   *Training Completed and Certifications Earned.* ............................................... 5
   *Training Delivered.* ........................................................................................... 6
   *Risk Management.* ............................................................................................. 6
   *Authorship.* ....................................................................................................... 7
   *Currently.* ......................................................................................................... 7
   Expert Case Consultation Objectivity ................................................................ 7

5. **Analysis Protocol.**........................................................................................... 8

   Terminology ....................................................................................................... 8
   Truth, Veracity, and Bias .................................................................................. 8
   Methodology ...................................................................................................... 8
   Nature and Status of Opinions ........................................................................... 9

6. **Scope of This Report.**..................................................................................... 10

7. **Background.**..................................................................................................... 11

8. **Facts or Data Considered.**............................................................................. 11

   Event Venue, Location, Weather, Lighting, and Timeframe ................................ 11
   Venue ............................................................................................................. 11
   Location.......................................................................................................... 11
   Weather .......................................................................................................... 11
   Lighting .......................................................................................................... 12
   Time................................................................................................................ 12
   Centrally Involved Individuals........................................................................... 12
   General Summary of Incident ............................................................................ 13

*Richard Billingslea –Narrative* ...........................................................................13
*Other Officer Statements.* ..................................................................................17
   Officer Hakeem Patterson .........................................................................17
*Involvement of Other Emergency Services Personnel.* .....................................17
*Witness Statements.* ..........................................................................................17
*Video Review.* ....................................................................................................18

**9.   Information Focus.** ...........................................................................................**20**
   *Of Note.* ............................................................................................................22

**10.  Human Factors Research.** ...............................................................................**22**
   Action vs. Reaction .............................................................................................22
   *In the instant case* ...........................................................................................23
   Speed of a Subject .............................................................................................23
   *In the instant case* ...........................................................................................24

**11.  Cognition and Performance During Stressful Events.** .................................**25**
   The Effect of Tense, Uncertain, and Rapidly Evolving Events ...........................25
   *In the instant case* ...........................................................................................26
   A Note Regarding Variations in Officers' Accounts of Events. ...........................26
   *In the instant case.* ..........................................................................................26
   Situational Awareness and Perceptual Narrowing .............................................27

**12.  Risk Management in Law Enforcement Force and Control.** ........................**28**
   Managing Force and/or Control Options .............................................................28
   *In the instant case* ...........................................................................................29
   Managing Risk Through Likely Outcomes ..........................................................29
   *In the instant case* ...........................................................................................30

**13.  Use of Force and Control – General Considerations.** ..................................**30**
   Perspective of a Reasonable Officer on the Scene. ...........................................30
   *The Rashomon Effect* .......................................................................................30
   *In the instant case* ...........................................................................................31

**14.  Analysis.** ..........................................................................................................**31**
   Analysis Context .................................................................................................31
   Use of Force by Officers – Generally .................................................................32
   Use of Force Under *Graham v. Connor* ............................................................32
   Application of the *Graham* Factors to Billingslea's Use of Force .......................33
   Consideration of Time and the Selection of Options ..........................................34
   *In the instant case.* ..........................................................................................35
   The Importance of Perspective...........................................................................35
   The Necessity for or Reasonableness of Force and Control...............................36
   *In the instant case* ...........................................................................................36

**15.  Opinions.** .........................................................................................................**36**

**16.  Compensation for Study and Testimony.** .....................................................**37**
   Compensation for Study, Analysis, Testimony, and Travel ................................37
   Compensation as of this Writing .........................................................................38

**17.  Exhibits.** ...........................................................................................................**38**

**Exhibit I – Document List** ....................................................................................**39**
   Documents ..........................................................................................................39
   References ..........................................................................................................45
   Table of Cases ....................................................................................................47

**Exhibit II – Curriculum Vitae** ......................................................................................**48**

    Special Qualifications ...............................................................................48

    Formal Education ......................................................................................49

    Current Employment ................................................................................50

    Employment History ...............................................................................50

    Expert Case Consultation .........................................................................52

    Membership Associations & Volunteer Activities ..................................52

    Instructor / Armorer Certifications Completed / Earned ..........................54

    Certificate Instructor Program Completed / Earned ...............................56

    Career Certifications Completed / Earned ...............................................56

    Awards and Recognition ..........................................................................57

    Publications (in the past ten years) ..........................................................57

    Guest Lecturer ..........................................................................................59

    Training Videos & Multimedia Productions ...........................................63

    Book Chapter ............................................................................................64

**Exhibit III – Prior Testimony** .......................................................................................**65**

    Law Enforcement & Criminal Courts ......................................................65

    Expert Court Testimony (within the past four years) ..............................65

**Exhibit IV – Fee Schedule** .............................................................................................**68**

*Provisos*

Gender Specificity: Unless referring – in context – to a specific individual, the use of masculine or feminine pronouns, i.e., he, she, her, his, etc., in this document is not intended to be gender specific.

Contemporaneous Context: Unless otherwise noted, identifying a reference in this report in the current context, i.e., is, is not meant to imply that the same reference was not identified in a past context, i.e., was, contemporaneous to the events being discussed.

Timing Calculations: Calculations of timing are based on any running on-screen display (OSD) clocks. Absent running OSD clocks, timing calculations are drawn from on-screen clocks incorporated into playback software, and are approximated to one second, to $\frac{1}{10}$ or $\frac{1}{100}$ of a second, accordingly.

Time Convention: Various case-related documents in the record may utilize standard time nomenclature, while others may utilize military time nomenclature. For example, 10:30:45 pm – or 10:30 pm and 45 seconds – converted to military time is equivalent to 22:30:45 hours. Similarly, some military times in the record may be expressed in a slightly revised format (but with no difference in meaning), e.g., 2230:45. Additionally, tenths or hundredths of a second will be expressed in decimal, e.g., 22:30:45.01.

Bracketed Comments: Unless otherwise noted, comments and information appearing in brackets – particularly in conjunction with quoted text passages – have been inserted by the author of this report, to assist the reader, or to aid in clarity.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| D'MARCO CRAFT, and | § | |
| MICHAELE JACKSON, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 2:17-cv-12752-GAD-MKM |
| | § | |
| RICHARD BILLINGSLEA, et al., | § | |
| | § | |
| Defendants. | § | |

## RULE 26(a) REPORT OF STEVEN D. ASHLEY

### SUBMITTED: AUGUST 22, 2019

## 1. DECLARATION OF STEVEN D. ASHLEY.

I, Steven D. Ashley, being of legal age and under penalty of perjury, state as follows:

1. I am a competent adult and have personal knowledge of the following facts, or believe them to be true based on information and belief. Facts about which I do not have personal knowledge are of the type reasonably relied upon by experts in this field and have probative value to me in rendering my opinions.

2. Attached hereto is a true and accurate copy of my expert report in this litigation.

3. This report summarizes my analyses and findings and includes a statement of my opinions. The report also includes facts or data considered by me in forming my opinions and sets out my qualifications (including my curriculum vitae).

4. My opinions are expressed to a reasonable, or higher, degree of professional certainty.

5. I affirm under penalty of perjury that the foregoing statements are true and correct.

_____
August 22, 2019
DATE

_____
STEVEN D. ASHLEY, MSc, MLS, ARM/P, AFSS, INCI
MONROE, MICHIGAN

## 2. INTRODUCTORY STATEMENTS.

The following introductory statements apply to this entire report, including any attached exhibits, which are to be incorporated as integral parts thereof. Some of these introductory statements may be reiterated in the body of this report.

*Not Legal Advice or the Practice of Law*. The expert services rendered in this case and this document are not legal advice, and are not to be construed, in any way, as the practice of law.

*Report Focus*. This report is focused solely on the incident captioned and related concerns and/or issues.

*Case Specific Limitation*. Any actions, statements, writings, this report, information, any testimony, etc., are specifically limited to this case.

*Expert Capacity*. This report and any subsequent reports, testimony, opinions, etc., are within my capacity as an independent criminal justice and governmental risk management expert.

*Right to Amend*. The opinions in this report are living opinions. That is, should additional discovery material be received, and/or additional research be completed, and then reviewed, these opinions may be altered and/or reinforced depending upon what information is obtained, reviewed, considered, and/or studied.

*Further Development*. The opinions expressed in this report are not necessarily final in nature. Rather, they are listed to comply with current report requests. Each opinion may be further developed through research, investigation, during deposition, and/or trial testimony.

*Specific References*. Some of the opinions in this report may list specific references to some of the documents reviewed and/or considered. These listings are not intended to be all inclusive. I specifically reserve the right to supplement the support for each of the opinions in this report.

*Newly Identified Issues*. If new issues are opined, identified, and/or developed subsequent to submission of this report, I reserve the right to supplement this report.

*Degree of Certainty*. All opinions stated in this report are in direct regard to the case captioned, and the underlying incident or events leading to this case, and are expressed to a reasonable, or higher, degree of professional certainty and/or probability.

*Discussions and Explanations of Underlying Issues*. Any discussion or explanation of underlying issues is intended to assist the reader with understanding some of the concepts that inform my opinions in this matter. They reflect my applicable skills and knowledge, as gained through my experience, education, and training.

*Credibility Determinations*. It is not my intent to make any credibility determinations in developing my opinions in this case.[1]

---

[1] I understand that credibility determinations are solely and exclusively within the province of the trier of fact, as instructed by the Judge.

3. **EXECUTIVE SUMMARY.**

My name is Steven D. Ashley. I was contacted and ultimately engaged in the above captioned matter – for the purpose of providing review, analysis, and opinions – regarding allegations made against former Detroit Police Officer Richard Billingslea.[2]

Incident Synopsis.[3] During the very early morning hours of May 31, 2017, Mr. D'Marco Craft and Mr. Michaele Jackson, drove to a gas station/convenience mart on Harper Avenue in Detroit, ostensibly for the purpose of purchasing cigarettes.

When they arrived there were two police officers at the convenience mart. There ensued an extended altercation between Craft and Jackson and several members of the Detroit Police Department. During this interaction, Mr. Craft was placed in handcuffs, and secured in a police vehicle, while Mr. Jackson was arrested following a physical altercation with Officer Billingslea inside the convenience mart.

After a period of time, Mr. Craft was released. Another officer took his iPhone as evidence, due to a recording that he had made of part of the incident.

Opinions in Brief. For the reasons set forth in this report, and to a reasonable – or higher – degree of professional certainty, I hold the following opinions.[4]

1. It is my opinion that the use of force and control by Detroit Police Officer Richard Billingslea, was based upon his perception that Michaele Jackson had assaulted him [Billingslea], had refused to comply with commands, and that he then physically resisted Billingslea's attempts to gain compliance and control.

2. It is my opinion that trained and experienced officers are likely to logically conclude that the reported actions of Michaele Jackson posed a threat or risk of serious injury or death to officers and others in the area.

3. Further, it is my opinion that police officers who do so conclude, would likely determine that it was necessary to use force and control methods in order for Billingslea to reduce the likelihood of serious injury or death to himself and that it would be logical and appropriate for them to reach that conclusion, considering their training and experience.

4. It is also my opinion that it is logical and appropriate to conclude that many of those officers, when faced with the same – or a substantially similar – situation as that reported by Officer Billingslea, would likely act in the same, or a similar, way as he did.

5. It is my opinion that, if similarly trained and experienced, and faced with the same or similar reported circumstances, other reasonable police officers would believe

---

[2] At the time of the events that gave rise to the instant case, Richard Billingslea was a police officer for the City of Detroit, Michigan. Mr. Billingslea is no longer employed by the City of Detroit. In the interest of clarity and brevity, Mr. Billingslea will be referred to as Officer Billingslea throughout this report.

[3] This is intended to be a very brief synopsis of general events, as reported by officers and others. A more detailed version of my understanding of events that reportedly occurred is included, *infra*.

[4] I hold any statements of opinion made here, or elsewhere in the body of this report, to a reasonable – or higher – degree of professional certainty, based upon my skill and/or knowledge, as gained through my education, experience, and/or training.

that the conduct and actions of Officer Billingslea were lawful in placing Michaele Jackson under arrest for assault, and resisting arrest.

6. It is my opinion that, if similarly trained and experienced, and faced with the same or similar reported circumstances, other reasonable police officers would believe that the conduct and actions of Officer Billingslea were lawful in using what force and control methods he did in his attempt to arrest and control Michaele Jackson.

7. It is my opinion that, if similarly trained and experienced, and faced with the same or similar reported circumstances, other reasonable police officers would believe that the conduct and actions of Officer Billingslea were lawful in preventing Craft and/or Jackson from entering the convenience mart, while the other remained outside, thereby splitting the attention of the two officers, and putting them in a tactically disadvantageous situation, contrary to typical officer safety training and protocols.

8. It is my opinion that Officer Billingslea's perceptions regarding the use of force were consistent with known human factors research.

9. It is my opinion that the later actions of Officer Billingslea regarding medical treatment for Michaele Jackson following the encounter were logical and appropriate, given the circumstances.

A reiterated statement of these opinions is set forth later in this report.[5]

## 4. EXPERT QUALIFICATIONS.[6]

Introduction to Qualifications. This report is provided based upon my personal and professional skill, knowledge, experience, education, and/or training, in and of the law enforcement, corrections, security, criminal justice, governmental service, and risk management fields, over the past 44 years and more.

I am a retired law enforcement officer, formerly employed as a full-time, sworn police officer, deputy sheriff, and law enforcement supervisor, trainer, and manager. As such, I have supervised and instructed law enforcement, security, and corrections officers – as well as supervisors, managers, and executives – in the performance of their duties, to include, *inter alia*, arrest, restraints, use of force and deadly force, conducted energy weapons, motor vehicle operations, corrections operations, and the training, supervision, and management of other criminal justice and municipal professionals, and trainers.

Credentials in Brief. More specifically, I served for 15 years as a professional law enforcement officer, trainer, and manager, with approximately one-half of that time as a supervisor, field supervisor, and manager. In addition to my certification as a Michigan police officer, I earned four Advanced Police Officer Training certificates, three Police Management Development certificates, and one Police Supervisor

---

[5] Other statements of opinion may be incorporated into the body of this report.
[6] My detailed Curriculum Vitae is attached to this report as Exhibit II.

Development certificate, from the Michigan Law Enforcement Officers Training Council.[7]

Subsequently, I served for 12 years as a full-time, credentialed, governmental risk manager. In that capacity, I counseled municipalities, municipal insurance pools, and other government entities – throughout the United States – on managing the risks of employee injuries and litigation, particularly as regards law enforcement and jail training, operations, and management.

_Formal Education._  I earned and was awarded a Bachelor of Arts Degree in Communication Arts, and a Master of Science Degree in Criminal Justice, from Michigan State University. Additionally, I earned and was awarded a Master of Liberal Studies Degree in Interdisciplinary Technology – with criminal justice focus – from Eastern Michigan University, graduating with a perfect academic record. I am a graduate of the Northwestern University School of Police Staff and Command, again with a perfect academic record. I completed and earned professional designations as an Associate in Risk Management, and as an Associate in Risk Management for Public Entities, from the Insurance Institute of America.[8] I successfully completed police academy training and earned certification as a Michigan police officer.

_Training Completed and Certifications Earned._  I have attended and successfully completed more than 6,000 hours of law enforcement, corrections, criminal justice, and public entity, operational and risk management related training. Much of my training has been – and is – of an advanced nature, and includes more than 50 law enforcement instructor, instructor-trainer, and Master instructor-trainer[9] certification courses. These advanced- and instructor-level courses include, _inter alia_, firearms, defensive tactics, officer safety and survival, aerosol weapons, impact weapons, handcuffing, weapon retention and disarming techniques, conducted energy weapons,[10] use of force, police driving, pursuit driving, emergency vehicle operations, and policy development.

I have been trained and certified as a TASER Senior Master Instructor,[11] by TASER International,[12] and hold a Master Use of Force Instructor™ certification from the

---

[7] MLEOTC, now formally renamed MCOLES (Michigan Commission on Law Enforcement Standards), is the state-mandated law enforcement certifying entity in Michigan.

[8] The Insurance Institute of America (IIA) was rebranded as _The Institutes_ in 2009. The Institutes is the insurance industry's primary credentialing organization.

[9] Instructor-trainer courses are often referred to as _train-the-trainer_ courses; Master Instructor-Trainers typically train other instructor-trainers.

[10] Conducted energy weapons are sometimes referred to as electronic control devices, conducted electronic devices, and other similar classifications. In some cases, the brand-name TASER is inappropriately applied as a generic reference. Generally – and in the context of this report – all of these terms have the same, or a similar, meaning.

[11] As such, I have trained hundreds of TASER Instructors, and hundreds of TASER Master Instructors (instructor-trainers), as well as TASER end-users. Notably, I trained TASER Master Instructors on downloads and the interpretation of same. Additionally, as part of the TASER, International, Quality Assurance Program, I was chosen to provide quality assurance oversight and review of TASER Master Instructors, as they presented instructor courses, at numerous locations across the United States.

[12] TASER, International, Inc., has been rebranded AXON Enterprise, Inc.

Police Policy Studies Council®, as well as a Master Force and Control Instructor™ certification from the Smith & Wesson Academy®.[13] I am an IADLEST® Nationally Certified Instructor (INCI)™, certified as a Charter INCI Member by the International Association of Directors of Law Enforcement Standards and Training.[14]

I am a Certified Force Science Analyst™, and an Advanced Force Science Specialist™, trained by the Force Science Institute®, and am an Instructor Graduate of the Law of Self Defense™ Instructor Program, presented by the Law of Self Defense Institute®. I successfully completed both the Federal Driving Instructor Training Program and the Federal Firearms Instructor Training Program, conducted by and at the Federal Law Enforcement Training Center.

_Training Delivered._  I have taught law enforcement, corrections, security, and criminal justice, courses at colleges, universities, civic organizations, and law enforcement agencies, throughout the United States. I have been an invited presenter on a broad range of law enforcement, security, corrections, and risk management topics, at numerous state, regional, national, and international conferences. Among the many topics I have taught – and upon which I have presented – are law enforcement and jail operations, policies and procedures, civil rights, arrest tactics, officer safety, use of force and deadly force, use of force management, training management, law enforcement driving, conducted energy weapons, law enforcement liability, and jail liability.[15]

Prior to my retirement after 22 years of service, I was the Use of Force Coordinator, Chief Firearms - Use of Force Instructor, and Chief Driving Instructor, for a college-based police academy. As such – along with program and curriculum development and oversight – one of my primary tasks was to train and certify use-of-force, firearms, and police driving instructors. Since 1976, I have personally delivered over 15,000 hours of training to more than 16,500 officers, trainers, supervisors, and managers.

_Risk Management._  As a credentialed risk manager, I have personally conducted more than 400 detailed – on-site – risk management reviews of law enforcement agencies and detention facilities, and have completed in-depth critical reviews of more than 500 law enforcement policy and procedure manuals[16] from law enforcement agencies

---

[13] This credential is sometimes referred to as a Master Use of Force Instructor certification.

[14] From the IADLEST.org website,  _"IADLEST is an association of standards and training managers and leaders. Its primary focus is criminal justice standards and training. To the extent that the focus and the values promoted thereby can be furthered and shared, all training professionals are welcome as members. The mission of IADLEST is to research, develop, and share information, ideas and innovations which assist states in establishing effective and defensible standards for employment and training of law enforcement officers, and, in those states where dual responsibility exists, correctional personnel."_ Accessed and retrieved by Steve Ashley on 28 May 2018.

[15] Training related to legal issues and constructs is presented from an informed lay-person's perspective.

[16] Operating manuals for criminal justice agencies are identified in many different ways: common naming conventions include, _inter alia_, policies, procedures, policies and procedures, rules and regulations, general orders, operating guidelines, standard operating procedures, and directives. Colloquially, these documents are often referred to as _policies_. In some contexts, rules and regulations are considered to be more oriented toward workplace rules, while policies and procedures are intended more as procedural

and jails located across the United States. These risk management and manual reviews routinely and frequently result in documented recommendations for improvement. In many cases, compliance with my recommendations has been mandated by municipalities' insurance carriers.

I have served on – as well as conceived, formulated, mentored, and managed – subject matter expert (SME) panels. The objective of said SME panels was the development of sample policies and suggested procedural guidelines for critical law enforcement, security, and corrections, management and operations.[17]

*Authorship.*  In my over 44 years as a criminal justice professional and trainer, I have authored and published more than 120 articles on various law enforcement, security, and criminal justice topics, in numerous publications. In my writing, my primary focus has been on use of force, police vehicle operations, and other critical aspects of law enforcement and corrections operations, as well as the training and supervision of criminal justice professionals. Additionally, I have – at the request of both authors and publishers – edited, fact-checked, and content reviewed, criminal justice and risk management-oriented manuscripts, books, periodicals, and publications, authored by other criminal justice professionals.

*Currently.*  I am an independent criminal justice advisor, risk manager, and trainer. As such, I conduct risk assessments of law enforcement and jail operations – as well as policy reviews – for agencies throughout the United States. I am frequently consulted for risk management advice by criminal justice leaders and municipal officials. Additionally, I present staff and management training for peace officers and corrections personnel, as well as public sector managers, trainers, and government officials.

I have the honor of serving as an Adjunct Professor of Justice and Public Policy, at Concordia University in Ann Arbor, Michigan. As such, I teach traditional undergraduate and graduate students in various courses, including Law Enforcement Policy and Practices, Administration of Justice, Corrections Theory and Practice, Juvenile Justice Theory, Foundations of Justice, Management of Law Enforcement Agencies, Ethics in Criminal Justice, Public Safety Risk Management, and others.

Expert Case Consultation Objectivity.  I have been privileged to provided expert consultation and review in more than 170 cases since 1994, approximately 75% of which have been defense cases. During the same years, I have had the honor of testifying as an expert – at deposition, hearing, or trial – 47 times in 41 cases, approximately 65% of which have been defense cases.[18]

---

guidelines. Within the context of this report – and unless specified differently – all these terms are defined as having generally the same meaning.

[17] Examples are the Law Enforcement Committee of the Michigan Municipal Risk Management Authority (MMRMA), the Law Enforcement Action Forum (LEAF committee) of the Michigan Municipal Liability and Property Pool (a division of the Michigan Municipal League), and the law enforcement advisory committee of the Iowa Communities Assurance Plan (ICAP).

[18] A listing of cases in which I have testified as an expert at deposition, hearing, or trial, in the past four years, is attached as Exhibit III.

5. **ANALYSIS PROTOCOL.**

In preparation of this review and development of associated opinions, I have conducted an analysis of much of the documentation and data currently available, and analysis continues.[19] These documents and other materials are of the type typically relied upon by consultants and experts when conducting analyses of law enforcement, corrections, security, and criminal justice issues, and have provided me with enough relevant data to develop my opinions to a reasonable – or higher – degree of professional certainty.

In addition to my evaluation of documents and other materials, I rely upon my skill and/or knowledge – as gained through my many years of experience, education, and/or training – in the law enforcement, security, corrections, and risk management fields; consultation with peers, review of professional literature, and independent research; as well as my understanding of the instant case.

Terminology.  Any opinions I proffer or statements that I make in this report that relate to legal terminology, standards, best practices, preferred practices, case law, or similar constructs, are drawn from my training and/or experience as a criminal justice practitioner, manager, educator, and trainer, as well as my experience and/or training as a researcher, governmental risk manager, and advisor. Use of specific legal terminology in this report is not intended to subvert the function of the court, or to inappropriately influence the role of the Jury or other trier of fact.[20]

Truth, Veracity, and Bias.  The following analysis is not intended to presume that any one version of the claims made in this case is more truthful than any other. Information drawn from various documents and other sources may be reported and contrasted for the purpose of relating events as they were perceived by those involved.[21]

Methodology.  I understand that a non-scientific expert must be qualified to offer expert testimony by skill, knowledge, experience, education, or training.[22] Similarly, I understand that the role of the expert is to provide specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue; and that said expert's contribution must be both relevant and reliable.[23]

---

[19] A listing of documents and data received, reviewed, or considered – thus far – is provided in the attached Document List as Exhibit I.

[20] Like many other criminal justice managers, trainers, and instructors, I use such terms in training that I present to police and corrections personnel, because they are commonly understood by criminal justice practitioners, and are typically used in daily operations by law enforcement and corrections professionals.

[21] Where practical I rely upon undisputed facts, and attempt to indicate those that are disputed when appropriate. Where facts and evidence appear to directly contradict statements and assertions of any party to this action, I attempt to point out the contradictions, and place them into context. Any apparent assumption of truth or implied assignment of veracity by me is undertaken solely for the purpose of analysis and the rendering of opinion, and is not intended to usurp the role of the Jury or other trier of fact.

[22] Fed. R. Evid. 702.

[23] *Kumho Tire Co., et al., v. Carmichael, et al.*, 526 U.S. 137, 147 (1999).

In this report I have provided both general and specific qualifications that demonstrate and illustrate my qualifications to provide expert testimony in this case.

The methodology I used in this case is the same that I have utilized for many years, and that has been peer-reviewed – at my request – by numerous other experts. Dependent upon the specific nature of each case, my methodology generally incorporates the following:[24]

- Orientation to case issues and elements;

- Review of provided case documents and materials;

- Development of a timeline, as well as a geographical and climatological context for the incident;

- Review of case related documents available on PACER and/or other on-line resources;

- Literature review regarding issues indicated in the instant case;

- General context consideration, regarding the backdrop of current and historical practices in relevant fields;

- Comparative analysis of case-related issues against the backdrop of current practices;

- Research and review of other relevant resource materials;

- Formulation of opinions.

This methodology has been accepted by presiding Judges in previous cases wherein I have had the privilege of testifying at trial. My methodology is consistent with that utilized by other experts in the field of criminal justice when conducting analyses of criminal justice practices.[25]

<u>Nature and Status of Opinions</u>.  Within the scope of the information thus far received, and unless otherwise indicated, each of my opinions is held to a reasonable – or higher – degree of professional certainty, whether stated in the body of this report, or in the opinions section.[26,27]

---

[24] While these elements are typically part of my methodology, not every element listed here is necessary – or will be undertaken – in every case.

[25] When feasible, on-scene examination is undertaken of the locales where the incident occurred. This aspect is sometimes completed after my report is submitted, but before sworn testimony is provided, either at deposition or trial.

[26] Some of the opinions that I have expressed in this report may contain references to some of the case specific documents reviewed or considered. Such references are not intended to be all-inclusive, and I specifically reserve the right to supplement the support for each of the opinions in this report.

[27] In this report, I state my opinions based upon my understanding of the incident and circumstances in question. That understanding is drawn from the documents and other information that is available to me as of this writing. Other documents and materials may yet be discovered, disclosed, or provided. As my review and consideration of documents continues, further discovery occurs, and/or other information becomes available, I reserve the right to modify, revise, extend, and/or affirm my opinions.

6. SCOPE OF THIS REPORT.

I was engaged by defense counsel, and was asked to review and opine regarding the actions of Detroit Police Officer Richard Billingslea concerning the events that gave rise to this action.[28]

I note that there are several claims asserted in this case. With respect to Officer Richard Billingslea:

- *Excessive force is claimed by Michaele Jackson.* This claim is a focus of this report.

- *Unlawful arrest is claimed by D'Marco Craft and Michaele Jackson.* Officer Billingslea did not arrest Craft. The claim by Jackson is a focus of this report.

- *Unlawful seizure of his cell phone/prevention of his ability to record the incident is claimed by D'Marco Craft.* Mr. Craft was not prevented from recording the incident. A different officer seized the cell phone. Billingslea logged the phone into evidence.

- *Unlawfully requiring him to put out a cigarette is claimed by D'Marco Craft.* Officer Billingslea was not involved in this action.

- *Unlawful seizure of his automobile is claimed by Michaele Jackson.* Officer Billingslea was not involved in this action.

- *Failure to provide medical care is claimed by Michaele Jackson.* EMS was called to the scene. Billingslea and several other officers offered Jackson first aid for his pepper spray exposure. Officers took him to hospital.

- Additionally, there are four claims by D'Marco Craft related to earlier alleged incidents. These claims are not a focus of this report.
    - 04/27/2016 A claim by Craft in which Officer Billingslea was one of three officers that stopped and cited D'Marco Craft.
    - June or July 2016 A claim by Craft of which there is apparently no record.
    - December 2016 A claim by Craft of which there is apparently no record.
    - 03/14/2017 A claim by Craft in which Officer Billingslea was only a back up officer, whose only involvement was to transport another individual (not Craft) to a detention center.

- Whatever Monell claims that are alleged in this case are not claimed against Officer Billingslea, and will not be addressed in this report.

---

[28] I note that while there are multiple officer defendants in this case – as well as the City of Detroit – Mr. Billingslea's case was bifurcated. I was specifically engaged to opine regarding Mr. Billingslea's case.

7. **BACKGROUND.**

This action arises out of allegations concerning an incident that occurred during the very early morning hours of Wednesday, May 31, 2017, involving officers of the Detroit, Michigan, Police Department.[29]

8. **FACTS OR DATA CONSIDERED.**

The following reflects my understanding of the events and circumstances that are alleged to have occurred during the incident that gave rise to the instant case. It is drawn from the information currently available to me and is an amalgam of the various accounts, information, and perceptions, related to my specific imprimatur in this case. It is not intended to be an exhaustive or exclusive recitation of events or circumstances.

Event Venue, Location, Weather, Lighting, and Timeframe. The events giving rise to the instant case occurred in and around a gas station/convenience mart located in the City of Detroit, Michigan. The events occurred during the very early morning hours of Wednesday, May 31, 2017.

*Venue.* The gas station/convenience mart is located at 17046 Harper Avenue – near Cadieux Road – on the east side of the City of Detroit, Michigan. The specific locations of events were both in a parking area outside, and in the aisleways inside, the convenience mart.

*Location.* As seen in contemporaneous videos, the parking area outside the convenience mart is paved in typical fashion. The interior of the convenience mart appears to be laid out in typical fashion, with a main aisle extending from the entry door across and in front of the counter area. There are several aisles running at right angles to this main aisle.

*Weather.*[30] At the time of the incident,[31] the weather was partly to mostly cloudy,[32] with temperatures in the mid 50's, and 75% humidity.[33] The dewpoint was 48°.[34] The

---

[29] Plaintiffs' Third Amended Complaint, Case Number 17-cv-12752, Document Number 72, PageID.920-PageID.965, Filed 01/30/2019.

[30] Historical weather readings utilized in this report originate from Coleman A. Young International Airport weather station, which is located approximately 3.5 miles west of the Harper/Cadieux intersection.

[31] The actual weather data were recorded at 12:53 am, and 1:53 am. "Weather for Coleman A. Young Airport, Detroit, MI for May 31, 2017". Weather Underground, 31 May 2017, https://www.wunderground.com/history/daily/us/mi/detroit/KDET/date/2017-5-31. Accessed and retrieved by Steve Ashley on 8 July 2019.

[32] "Weather for Coleman A. Young Airport, Detroit, MI for May 31, 2017". Weather Underground, 31 May 2017, https://www.wunderground.com/history/daily/us/mi/detroit/KDET/date/2017-5-31. Accessed and retrieved by Steve Ashley on 8 July 2019.

[33] "Weather for Coleman A. Young Airport, Detroit, MI for May 31, 2017". Weather Underground, 31 May 2017, https://www.wunderground.com/history/daily/us/mi/detroit/KDET/date/2017-5-31. Accessed and retrieved by Steve Ashley on 8 July 2019.

[34] "Weather for Coleman A. Young Airport, Detroit, MI for May 31, 2017". Weather Underground, 31 May 2017, https://www.wunderground.com/history/daily/us/mi/detroit/KDET/date/2017-5-31. Accessed and retrieved by Steve Ashley on 8 July 2019.

---

moon was at moonset.[35] The wind was out of the southwest at approximately 6 - 8 mph.[36] There had been no precipitation recorded for the previous 24 hours.[37,38]

*Lighting*. As seen in contemporaneous videos, artificial lighting was present both in the parking area and inside the convenience mart. The interior of the mart appears especially well-lit.

*Time*. Reports completed by the initiating officers (Patterson and Billingslea) each indicate that the incident time was 1:40 [am].[39,40]

Centrally Involved Individuals. Various law enforcement officers and individuals are mentioned in the documentation of this case. This report primarily focuses on the following:[41]

- *D'Marco Craft, Plaintiff*.[42] D'Marco Craft (Mr. Craft, Craft) was reportedly a passenger in a vehicle operated by Michaele Jackson. Mr. Craft was involved in an incident which culminated in an interaction between him and several Detroit officers.

- *Michaele Jackson, Plaintiff*.[43] Michaele Jackson (Mr. Jackson, Jackson) was reportedly the operator of a vehicle in which D'Marco Craft was a passenger. Mr. Jackson was involved in an incident which culminated in an altercation between him and several Detroit officers, during which Jackson was arrested.

- *Richard Billingslea, a named Defendant*.[44] At the time of this incident, Richard Billingslea (Officer Billingslea, Mr. Billingslea, Billingslea) was employed as a police officer by the Detroit Police Department. On May 31,

---

[35] "Sun and Moon Data for One Day for Wednesday, May 31, 2017"; U.S. Naval Observatory Astronomical Applications Department; https://aa.usno.navy.mil/rstt/onedaytable?ID=AA&year=2017&month=5&day=31&state=MI&place=Detroit. Accessed and retrieved by Steve Ashley on 8 July 2019.

[36] "Weather for Coleman A. Young Airport, Detroit, MI for May 31, 2017". Weather Underground, 31 May 2017, https://www.wunderground.com/history/daily/us/mi/detroit/KDET/date/2017-5-31. Accessed and retrieved by Steve Ashley on 8 July 2019.

[37] "Weather for Coleman A. Young Airport, Detroit, MI for May 31, 2017". Weather Underground, 31 May 2017, https://www.wunderground.com/history/daily/us/mi/detroit/KDET/date/2017-5-31. Accessed and retrieved by Steve Ashley on 8 July 2019.

[38] "Weather for Coleman A. Young Airport, Detroit, MI for May 30, 2017". Weather Underground, 30 May 2017, https://www.wunderground.com/history/daily/us/mi/detroit/KDET/date/2017-5-30. Accessed and retrieved by Steve Ashley on 8 July 2019.

[39] Detroit Police Use of Force or Detainee Injury Report of Officer Hakeem Patterson, CRISNET File Number 1705310034, dated 05/31/2017.

[40] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017.

[41] This proviso is made for the sake of brevity, and is not intended to imply that any individual associated with the instant case is less credible, or that their information is less relevant or material. Any other – more tangentially – involved individuals may be listed elsewhere in this report.

[42] Plaintiffs' Third Amended Complaint, Case Number 17-cv-12752, Document Number 72, PageID.920-PageID.965, Filed 01/30/2019.

[43] Plaintiffs' Third Amended Complaint, Case Number 17-cv-12752, Document Number 72, PageID.920-PageID.965, Filed 01/30/2019.

[44] Plaintiffs' Third Amended Complaint, Case Number 17-cv-12752, Document Number 72, PageID.920-PageID.965, Filed 01/30/2019.

2017, Billingslea was in modified uniform (with name and badge visible) and driving a semi-marked Detroit Police vehicle.[45] Billingslea and his partner – Hakeem Patterson – were assigned to Special Operations, and were working as a two-man crew, designated Scout 5/36.[46]

- *Hakeem Patterson, a named Defendant*.[47] At the time of this incident, Hakeem Patterson (Officer Patterson, Patterson) was employed as a police officer by the Detroit Police Department. On May 31, 2017, Patterson was in modified uniform (with name and badge visible) and riding as passenger in a semi-marked Detroit Police vehicle.[48] Patterson and his partner – Richard Billingslea – were assigned to Special Operations, and were working as a two-man crew, designated Scout 5/36.[49]

General Summary of Incident. The general incident description that follows is drawn primarily from the report and testimony of Officer Billingslea, as his perceptions and impressions were those that informed his actions during the incident.

*Richard Billingslea –Narrative.* The following is drawn from Officer Richard Billingslea's statements in his written narrative, which was part of his initial report of the incident.[50,51] It, supplemented by his later deposition testimony, is based on Billingslea's reported perception of the incident. His account is augmented here with some other appropriate information.

On the night of the incident Officers Richard Billingslea and Hakeem Patterson were working as partners; they were each wearing a Detroit Police Department modified Special Operations uniform, with their badges showing.[52] They were operating a Detroit Police semi-marked scout car, which was parked outside the convenience mart during the incident.

At approximately 1:30 am, Billingslea and Patterson stopped at a service station/convenience mart. Patterson waited in their scout car outside the mart, while

---

[45] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017.

[46] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017.

[47] Plaintiffs' Third Amended Complaint, Case Number 17-cv-12752, Document Number 72, PageID.920-PageID.965, Filed 01/30/2019.

[48] Detroit Police Use of Force or Detainee Injury Report of Officer Hakeem Patterson, CRISNET File Number 1705310034, dated 05/31/2017.

[49] Detroit Police Use of Force or Detainee Injury Report of Officer Hakeem Patterson, CRISNET File Number 1705310034, dated 05/31/2017.

[50] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017.

[51] Although there are multiple defendant officers, because Richard Billingslea's case was bifurcated, and I was specifically engaged to review and opine regarding his actions, by his defense counsel, this account is primarily informed by his perception of events as indicated in his written narrative and testimony.

[52] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017.

Billingslea was inside, using the restroom, which is located behind the counter area.[53] When Billingslea came out of the restroom, he saw D'Marco Craft out in front of the counter. Billingslea reports that Craft looked at him, loudly made a disparaging, profane remark, *"put up both middle fingers"*[54] and walked out the door.[55] Billingslea followed to the doorway, and there ensued a verbal interaction in the parking area. Billingslea radioed for back up units.[56] Craft went to his vehicle briefly, then attempted to return to the convenience mart. Billingslea did not let Craft enter the mart because he wanted to keep him outside, where he could see both Craft and Jackson, as well as his partner, Officer Patterson.[57]

As Billingslea was standing in the doorway (in clearly recognizable uniform) following this interaction, Billingslea noted that Craft returned to his vehicle,[58] and later testified that he told Jackson they should leave and go elsewhere to purchase cigarettes. Instead, Michaele Jackson got out of the vehicle and approached Officer Billingslea, *"yelling and shouting in a very aggressive manner"*[59] Jackson later testified that he didn't know, and didn't care, that Billingslea was a police officer.[60] Billingslea reported that Jackson, who was unknown to him, then *"attempted to push past [him]"*[61] at the door to the convenience mart. Although Billingslea was apparently not aware of it at the time, later video review indicates that Jackson reached around Billingslea in the direction of his sidearm.[62]

Officer Patterson observed the altercation in the doorway from his seat in the scout car.[63] Officer Patterson left the scout car and approached.[64] Officer Billingslea reports that he and Patterson took Jackson to the ground outside the mart, *"in an attempt to deescalte [sic] the situation due to his [Jackson's] active aggression."*[65] However, as

---

[53] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017.

[54] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

[55] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017.

[56] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017.

[57] Deposition transcript of Richard Billingslea, dated 06/07/2019, with attached exhibits, pp.58-59.

[58] Video file titled *Composite- Gas Station Surveillance Video.mp4*, [length 00:15:24], UTC encode date 05/31/2017.

[59] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

[60] Deposition transcript of Michaele Jackson Jr., dated 06/21/2019, with attached exhibits, pp. 125-126.

[61] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

[62] Video file titled *Composite- Gas Station Surveillance Video.mp4*, [length 00:15:24], UTC encode date 05/31/2017.

[63] Detroit Police Use of Force or Detainee Injury Report of Officer Hakeem Patterson, CRISNET File Number 1705310034, dated 05/31/2017.

[64] Detroit Police Use of Force or Detainee Injury Report of Officer Hakeem Patterson, CRISNET File Number 1705310034, dated 05/31/2017.

[65] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

---

Billingslea and Patterson were working to control Jackson, Billingslea perceived that he [Jackson] calmed down, so they allowed him to get up off the ground.[66] Later, Billingslea testified that he was *"trying to give [Jackson] the benefit of the doubt to leave."*[67] Rather than doing so, Jackson got to his feet, walked around the gas pump island, and entered the convenience mart, contrary to Billingslea's instructions.[68,69] Billingslea testified that Jackson acted and sounded drunk.[70] Billingslea also testified that he was attempting to keep both Craft and Jackson together outside the convenience mart where his partner – Patterson – was, until other officers arrived to assist.[71]

Billingslea followed Jackson into the mart, reportedly giving him verbal commands to leave the premises, which Jackson did not do. Billingslea reached out to grab Jackson, but Jackson swung his arm across, batting away Billingslea's hand. Billingslea again reached out, this time taking Jackson by the arm. When he did so,[72] Jackson *"clicned [sic] his right hand displaying active aggression, the arrestee swung his right closed fist toward my head face area [sic]"*.[73,74] Billingslea testified that he was able to avoid the blow to his head, and was instead struck on his shoulder.[75]

Billingslea reported that he drew his OC spray[76] and *"ordered the arrestee to get on the ground or you are going to be sprayed."*[77] When Jackson did not comply, Billingslea reported that he sprayed him with a *"2-3 second birst [sic] in the direction of arrestees face and then grabbed him around the upper torso and brought him to the ground so he could be handcuffed."*[78]

Officer Patterson entered the store as this was occurring, but was reportedly engaged in attempting to control Mr. Craft, who he perceived was actively interfering by

---

[66] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017.

[67] Deposition transcript of Richard Billingslea, dated 06/07/2019, with attached exhibits, p. 57.

[68] Video file titled *Composite- Gas Station Surveillance Video.mp4*, [length 00:15:24], UTC encode date 05/31/2017.

[69] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

[70] Deposition transcript of Richard Billingslea, dated 06/07/2019, with attached exhibits, p. 91.

[71] Deposition transcript of Richard Billingslea, dated 06/07/2019, with attached exhibits, pp. 91-92.

[72] Video file titled *Composite- Gas Station Surveillance Video.mp4*, [length 00:15:24], UTC encode date 05/31/2017.

[73] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

[74] Deposition transcript of Richard Billingslea, dated 06/07/2019, with attached exhibits, pp. 93-94.

[75] Deposition transcript of Richard Billingslea, dated 06/07/2019, with attached exhibits, p. 93.

[76] OC spray is oleoresin capsicum, or what is colloquially referred to as pepper spray.

[77] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

[78] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

verbally interjecting comments as he attempted to get closer to the altercation, and not following commands to back away.[79]

Once Jackson was on the floor, Billingslea reportedly ordered him to put his hands behind his back which he would not do. Billingslea delivered distraction strikes to Jackson[80] when Jackson continued to resist.[81] Jackson was reportedly *"clinching his fist [sic] underneath [sic] his body."*[82] Jackson had not yet been searched for weapons; Billingslea was concerned that he may be armed.[83]

Officer Patterson continued to be distracted by his efforts to deal with Craft, and was thus unable to assist Billingslea. Officer Billingslea held Mr. Jackson on the floor until other officers arrived to assist with the handcuffing. Eventually, Officers Brown, Bines, and Hill, arrived and assisted Billingslea.[84] Once handcuffed, the still resisting Jackson was placed into a scout car. A few moments later, Officer Billingslea reportedly approached Jackson with water, with which to rinse out his eyes;[85] Jackson reportedly refused.[86] Other officers can be heard on video asking repeatedly if Jackson is refusing to have his eyes flushed; Jackson does not answer, but demands to have a supervisor come to the scene.[87] EMS was called and responded to the scene. One of the Medics approached and spoke with Mr. Jackson; determined that Jackson did not need immediate treatment, and turned him over to the officers, who – a short time later – transported him to Detroit Receiving Hospital, where he was seen by a physician.[88]

During the incident, another officer had taken Mr. Craft's cell phone, as he learned that it contained video of the incident.[89] Officer Billingslea reported that he *"recovered Mr Crafts [sic] cell phone to place on evidence which showed some video footage of the incident."*[90] Billingslea logged the phone into evidence, and it was later returned to Mr. Craft.

---

[79] *"Active resistance includes '[ … ] disobeying officers." Rudlaff v. Gillispie*, 791 F3d 638, 641 (6 Cir. 2015).

[80] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

[81] Video file titled *Craft's Cell Phone Video.MOV*, [length 00:03:02], UTC encode date 05/31/2017.

[82] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

[83] Deposition transcript of Richard Billingslea, dated 06/07/2019, with attached exhibits, pp. 38-39, 49.

[84] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017, p. 3.

[85] According to most – if not all – OC spray manufacturers, first aid for an OC exposure consists of fresh air and flushing with water, along with the passage of time.

[86] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017, p. 3.

[87] Video file titled *Naim Brown's Body-Camera Video.mp4*, [length 00:29:35], no encode date.

[88] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017, p. 3.

[89] Deposition transcript of Antoine Hill, dated 05/31/2019, with attached exhibit, p. 17.

[90] Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017, p. 3.

*Other Officer Statements.*  There were several other officers at the gas station/convenience mart, either during or following the events that gave rise to the instant case. Their various statements are generally, materially consistent with Officer Billingslea's version of events.

*Officer Hakeem Patterson* was Billingslea's partner, and was not in the convenience mart when the interaction between Billingslea and Craft began. Patterson did observe Jackson's behavior outside the mart, and assisted Billingslea in initially taking Jackson to the ground outside the mart.[91] After Jackson entered the mart, Patterson eventually followed Billingslea inside, and heard Billingslea say that Jackson had tried to hit him.[92] Patterson saw Billingslea take Jackson to the floor, but was distracted by Craft, who was nearby.[93] Patterson was trying to keep an eye on Craft until back up officers arrived.[94]

*Involvement of Other Emergency Services Personnel.*  Following Michaele Jackson's arrest, Detroit EMS were summoned to the scene; they did not witness any of the events leading to the arrest. In the aftermath, one medic approached Jackson and asked if he wanted EMS to treat him. Jackson did not answer, so the Medic advised officers that *"he doesn't need stitches"*.[95] Ultimately, Jackson was transported to hospital by other officers [not Billingslea] in Scout 5-37.

*Witness Statements.*  There was a convenience mart employee in the store during the incident. I reviewed a video recording, and also a transcript, of his deposition. I note the following from his testimony:

• The employee's name is Mohammad [phonetic] Almasmary, and he was the counter clerk on the night shift during the incident.[96]

• Mr. Almasmary has very little memory of the incident, remembering almost no details.[97]

• When shown a video of the incident, his memory was only partially refreshed.

• He saw nothing that occurred outside.[98]

• Once [Jackson] and [Billingslea] entered the store, he is seen on the video telling Jackson to *"relax"*. Mr. Almasmary testified that he was trying to tell both Jackson and Billingslea to relax.[99]

---

[91] Detroit Police Use of Force or Detainee Injury Report of Officer Hakeem Patterson, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

[92] Detroit Police Use of Force or Detainee Injury Report of Officer Hakeem Patterson, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

[93] Detroit Police Use of Force or Detainee Injury Report of Officer Hakeem Patterson, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

[94] Detroit Police Use of Force or Detainee Injury Report of Officer Hakeem Patterson, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

[95] Video file titled *Naim Brown's Body-Camera Video.mp4*, [length 00:29:35], no encode date.

[96] Deposition transcript of Hakeem Patterson, dated 06/07/2019, with attached exhibits.

[97] Deposition transcript of Hakeem Patterson, dated 06/07/2019, with attached exhibits.

[98] Deposition transcript of Hakeem Patterson, dated 06/07/2019, with attached exhibits.

[99] Deposition transcript of Hakeem Patterson, dated 06/07/2019, with attached exhibits.

- Before watching the video, Mr. Almasmary testified that he didn't see Jackson swing at the officer. After watching the video, he seemed to remember Jackson taking a swing at Billingslea.[100]

- He does not remember seeing a cell phone in the store during the incident.[101]

- He testified that he did not give copies of the store videos to the Sergeant that asked for them, as he did not have access to the password for the system.[102]

There is another individual – a delivery driver – on video early in the incident, apparently stocking shelves. Mr. Almasmary does not know his name.[103]

*Video Review.* There are numerous video recordings covering various portions of the incident. Some recordings show limited parts of the initial encounters, while most show various perspectives of the aftermath. This is especially true of many of the individual officers' body camera recordings.

There are several surveillance videos from the convenience mart's security system. While these do not completely portray events as reported by Officers Billingslea and Patterson, they do appear to be materially consistent with the following:

- Michaele Jackson is seen attempting to push past Billingslea at the door of the mart.[104]

- As he tries to push past Billingslea, Jackson's left hand is seen reaching around Billingslea's duty belt, and fumbling in the vicinity of Billingslea's sidearm.[105]

- Billingslea is seen pushing Jackson away in the doorway, apparently just before he and Patterson take Jackson to the ground outside the mart.[106]

- Jackson is seen yelling and walking around the gas pump island prior to reentering the mart.[107]

- Jackson is seen reentering the mart, followed by Billingslea. Billingslea is seen reaching out toward Jackson, as Jackson backs away from him.[108]

- Jackson is seen sweeping his hand across and brushing Billingslea's hand away.[109]

---

[100] Deposition transcript of Hakeem Patterson, dated 06/07/2019, with attached exhibits.

[101] Deposition transcript of Hakeem Patterson, dated 06/07/2019, with attached exhibits.

[102] Deposition transcript of Hakeem Patterson, dated 06/07/2019, with attached exhibits.

[103] Deposition transcript of Hakeem Patterson, dated 06/07/2019, with attached exhibits.

[104] Video file titled *Camera 2.mp4*, [length 00:16:20], UTC encode date 05/31/2017.

[105] Video file titled *Camera 2.mp4*, [length 00:16:20], UTC encode date 05/31/2017.

[106] Video file titled *Camera 2.mp4*, [length 00:16:20], UTC encode date 05/31/2017.

[107] Video file titled *Composite- Gas Station Surveillance Video.mp4*, [length 00:15:24], UTC encode date 05/31/2017.

[108] Video file titled *Camera 2.mp4*, [length 00:16:20], UTC encode date 05/31/2017.

[109] Video file titled *Composite- Gas Station Surveillance Video.mp4*, [length 00:15:24], UTC encode date 05/31/2017.

- Billingslea is seen reaching out and grasping Jackson's upper left arm in an escort hold. Jackson is seen then turning to his left, and punching at Billingslea with his right hand,[110] narrowly missing Billingslea's face and head.[111]

- Mr. Almasmary is seen facing Jackson, and telling him several times to relax.[112] Jackson momentarily raises his hands into a two-fisted fighter's stance.[113]

- Jackson steps toward Mr. Almasmary, who puts out his hand to hold Jackson away.[114]

- Billingslea is seen drawing his OC spray, and spraying it toward Jackson. Jackson is apparently unaffected by the spray, and does not appear to react, although he does turn away to face toward the counter.[115]

- Patterson is seen entering the mart, distracted by Craft.[116]

- Billingslea is seen grasping the larger Jackson from behind, with his right arm over Jackson's right shoulder and lower neck area. Billingslea pulls Jackson backwards, and down to the floor.[117]

- Once on the floor, there is an on-going struggle between Billingslea and Jackson, as Billingslea tries to take Jackson into custody. Jackson resists, moving around and attempting to get up,[118] while keeping his hands out of sight under his body.[119] This continues until other officers arrive to assist Billingslea.

- After he is handcuffed, Jackson continues to resist officers' efforts to control him.

- Later, there are several recordings that show Jackson being offered water to flush his eyes; Jackson either refuses to answer or declines the water.

---

[110] Video file titled *Camera 2.mp4*, [length 00:16:20], UTC encode date 05/31/2017.

[111] Video file titled *Composite- Gas Station Surveillance Video.mp4*, [length 00:15:24], UTC encode date 05/31/2017.

[112] Video file titled *Camera 2.mp4*, [length 00:16:20], UTC encode date 05/31/2017.

[113] Video file titled *Composite- Gas Station Surveillance Video.mp4*, [length 00:15:24], UTC encode date 05/31/2017.

[114] Video file titled *Composite- Gas Station Surveillance Video.mp4*, [length 00:15:24], UTC encode date 05/31/2017.

[115] Video file titled *Camera 2.mp4*, [length 00:16:20], UTC encode date 05/31/2017.

[116] Video file titled *Camera 2.mp4*, [length 00:16:20], UTC encode date 05/31/2017.

[117] Video file titled *Camera 2.mp4*, [length 00:16:20], UTC encode date 05/31/2017.

[118] Deposition transcript of Richard Billingslea, dated 06/07/2019, with attached exhibits, p. 90.

[119] Video file titled *NAIMBROWN842_201705310134_WFC1008651_ 14707467.mp4*, [length 00:29:35], no encode date.

9.  **INFORMATION FOCUS.**

I draw the reader's attention to the following items, in order to specifically focus on or to underscore additional points that inform my opinions.[120]

- During the initial encounter between Officer Billingslea and D'Marco Craft, Craft moved close to Billingslea, and Billingslea moved him away with a straight arm, while cautioning him to back up.

- After his initial interaction with Mr. Craft, Officer Billingslea did not follow him outside; rather, he – in effect – walked away.

- Craft returned to the car, and advised Jackson of the situation, and that they should go to a different location to get their cigarettes.

- Jackson refused, and determined to go into the mart anyway.

- Although Billingslea had had previous encounters with Craft, Billingslea reportedly did not know Mr. Jackson.

- Michaele Jackson chest bumped and pushed against Officer Billingslea at the door of the mart.

- Billingslea testified that Jackson appeared drunk.

- Billingslea attempted to move Jackson away, and Jackson resisted, grappling with him in the doorway of the convenience mart.

- Jackson can be seen reaching around Billingslea's right side, and moving his hand around the vicinity of Billingslea's sidearm.

- Billingslea – assisted now by his partner, Hakeem Patterson – moves the altercation outside the mart, and takes the resisting Jackson to the ground.

- Craft moves close to the officers, recording the encounter on his cell phone. Billingslea does not stop him from recording; he wants Craft to move away from the officers.

- Jackson initially resists, then appears to calm down. Billingslea and Patterson let him get up. A verbal exchange occurs between Patterson and Jackson, as well as between Billingslea and Craft, as Billingslea moves Craft away.

- Craft's actions throughout the encounter distract the officers from focusing on Jackson, splitting their attention.

- At this point, neither Craft nor Jackson has been patted down for weapons.[121]

- Jackson walks around the gas pumps while shouting, then enters the convenience mart, pushing past the store clerk – Mr. Almasmary – in the doorway.

---

[120] This sequence can be followed in the video recording titled *Composite- Gas Station Surveillance Video.mp4*, [length 00:15:24], UTC encode date 05/31/2017.

[121] The fact that Jackson was not searched for weapons during the initial take-down outside the convenience mart was consistent with typical police training. Officers have long been trained to search subjects after they are handcuffed – not before – as an officer safety measure.

- Billingslea follows, and reaches toward Jackson as Jackson backs away. Jackson resists, sweeping his hand across, pushing Billingslea's outstretched hand away.

- Billingslea attempts to take control of Jackson by taking him by the left arm in an escort attitude. Billingslea has his radio microphone in his left hand.

- Jackson resists, pulling away and assuming a semi-crouch fighting stance, with his right hand clenched into a fist.

- Jackson then swings a roundhouse punch toward Billingslea's head with his right fist, while simultaneously pushing his left hand and arm into Billingslea's chest. Billingslea is able to avoid most of the blow, but is struck on the shoulder and chest.

- Jackson steps back, momentarily raising both his fists to a fighter's stance, before turning his attention to the store clerk. Jackson moves toward the clerk, who puts out his arm to hold Jackson back.

- Billingslea draws his pepper spray, and sprays Jackson, apparently to no effect.[122]

- Patterson and Craft enter the mart just as Billingslea sprays Jackson.

- Billingslea approaches Jackson, and grasps him around his right shoulder and neck area, displacing Jackson's balance, while pulling him backwards and down toward the floor. Billingslea appears to momentarily lose his grip on the larger, heavier, Jackson, causing Jackson to fall toward the floor and into a merchandise rack.

- Once Jackson is on the floor, Billingslea struggles with him, using verbal commands and distraction blows in an attempt to get Jackson's hands behind his back. Jackson is holding his hands beneath his body, out of sight of Officer Billingslea,[123] and tries to get up.[124]

- Patterson is distracted by Craft, who moves close while filming. Neither officer stops Craft from recording, although Patterson moves Craft away from Billingslea and Jackson.

- Jackson is eventually handcuffed with the assistance of other officers who arrive as back up.

- Jackson continues to struggle and resist after being cuffed, both while on the floor and while being escorted to a scout car. However, it appears that no additional blows are struck once he is handcuffed.

---

[122] Pepper spray is a pain compliance tool. Officers are trained that intoxicated, deranged, or enraged people often do not respond to pain compliance techniques, because they are impervious to pain.

[123] This is a common attitude assumed by resisting suspects; they bend their arms in a *barbell curl* posture, with muscles tensed. This makes their arms very difficult to pull from beneath their body. The technique is a prone modification of a well-known Jiu-Jitsu move known as the Turtle Position or Turtle Defense. It is colloquially known to officers as *turtling*.

[124] Deposition transcript of Richard Billingslea, dated 06/07/2019, with attached exhibits, p. 90.

- During the actual incident, Officer Billingslea had limited information regarding who Jackson was, what Jackson's primary motivation was, and what exactly was happening.

- Billingslea and Patterson were clearly aware that their actions were being recorded,[125] and took no action to prevent it.

- The situation was chaotic and developed suddenly; one moment Billingslea was verbally interacting with D'Marco Craft, and a few moments later, he was bumped and pushed by Michaele Jackson. Following additional interaction with Jackson, Billingslea is punched by Jackson while attempting to arrest him.

- Michaele Jackson had at least two opportunities to – in effect – walk away from this encounter.[126] He chose not to do so.

As stated, *supra*, this incident happened very quickly. While the timing is approximate, the record indicates that roughly five minutes elapsed, from the time that Craft and Jackson stopped their vehicle at the gas pump island until Jackson was actually handcuffed on the floor of the convenience mart. From the moment that Jackson entered the convenience mart, until he punched Officer Billingslea was approximately seven seconds.[127]

*Of Note.* Much of the interaction between the officers and D'Marco Craft and Michaele Jackson can be characterized as male posturing and profane street talk. While this may be regrettable, in my view it constitutes a side-issue.

## 10. HUMAN FACTORS RESEARCH.

Action vs. Reaction.  Police officers are trained that action beats reaction.[128] By way of illustration, time and movement action/reaction research conducted through and by the Force Science Institute[129] has shown that even an average, untrained, individual can draw and fire a concealed handgun from his or her waistband in less than $^{23}/_{100}$ of a second, with some untrained individuals able to do so in $^{9}/_{100}$ of a second.[130,131]

---

[125] Deposition transcript of Richard Billingslea, dated 06/07/2019, with attached exhibits, p. 89.

[126] Once when Craft returned to the vehicle and told Jackson to go to a different store for cigarettes, and once when Billingslea and Patterson let him up from the concrete following the first takedown.

[127] Video file titled *Composite- Gas Station Surveillance Video.mp4*, [length 00:15:24], UTC encode date 05/31/2017.

[128] Joyner, C. (2011). Advanced Concepts in Defensive Tactics: A Survival Guide for Law Enforcement. Boca Raton FL: CRC Press. 66-67.

[129] Originally located at Minnesota State University-Mankato; The Force Science Institute training center is now headquartered in Des Plaines, Illinois.

[130] Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? *The Police Marksman, 27*(6). 20-28.

[131] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

Other research shows that even novice shooters can fire at least three rounds in 1.5 seconds.[132]

In counterpoint, similar research shows that – under laboratory conditions – an average police officer, with his gun out and pointed at an identified target, with the officer's finger on the trigger, and being psychologically set, is able to react to a stimulus and pull the trigger of a handgun in between ¼ and ⅓ of a second.[133,134,135]

However, police trainers have long understood[136] that, in the field, officers' reaction times to all sorts of stimuli will be slowed by distractions in the environment, and the frequent need to multitask. Reaction times are also often affected by the need to choose from among several available tactics, weapon options, or courses of action. This phenomenon is recognized by police trainers[137] as a manifestation of a rubric known as *Hick's Law*,[138] which states that, as one's options or choices increase, the time required to choose from among those options increases logarithmically.[139] This can also apply to the need to focus attention on more than one subject, or the distracting behavior of one or more individuals.

So, in short, a seemingly unarmed or non-threatening suspect can produce and use a concealed firearm or other weapon before an officer (who already has his gun out and pointed at the suspect, with his finger on the trigger) can react to the threat and/or fire at the suspect.

<u>*In the instant case*</u>.  Potential examples of Hick's Law can be seen in the instant case, when – as can be seen throughout the video of the encounter – D'Marco Craft's frequent interference and verbal interjections distracted both Billingslea and especially Patterson from focusing on the assaultive and unpredictable nature of Jackson's behavior. Additionally, Mr. Almasmary was distracted and confused about the nature and sequence of events.

<u>Speed of a Subject</u>.  Officers are always concerned about the hands of a subject, especially when they cannot see them, such as when an individual *turtles* his hands and arms under his body. Additional human factors research has shown that an individual can point a handgun at an officer, and then turn away so quickly that, by

---

[132] Lewinski, W. J., & Redmann, C. (2009). New Developments in Understanding the Behavioral Science Factors in the "Stop Shooting" Response. *Law Enforcement Executive Forum. 9*(4). 35-54.

[133] Force Science Research Center, Force Science Institute, Des Plaines, Illinois.

[134] Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? *The Police Marksman, 27*(6). 20-28.

[135] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

[136] Remsberg, C., Adams, R. J., & McTernan, T. M. (1980). *Street Survival: Tactics for Armed Encounters*. Evanston IL: Calibre Press. 126.

[137] Siddle, B. K. (2004). *PPCT Defensive Tactics Instructor Manual – United States edition*. Belleville IL: PPCT Management Systems. 1-9.

[138] Sometimes referred to as the *Hick-Hyman Law*, after British and American psychologists William Edmund Hick and Ray Hyman.

[139] Jennett, S. (Ed.). (2008). Churchill Livingstone's Dictionary of Sport and Exercise Science and Medicine. New York: Elsevier Limited.

the time the officer perceives the dangerous move and reacts by pulling the trigger of his own handgun, the individual will have completely turned away and presented his back to the officer. The average time for such an individual pointing a handgun at an officer, to then turn away to a squared back posture is $^{14}/_{100}$ of a second, with some individuals completing the maneuver in even less time.[140,141] This sometimes results in an officer firing in defense of his own life, and the suspect sustaining gunshot wounds to his side or back.

This general concept holds true even when the individual is seated, as if in a vehicle. Research with a seated subject, with a handgun in his right hand, and the weapon held down to the subject's right, as if it were concealed alongside or below the subject's right thigh, indicates that the subject can bring the weapon up and discharge a round through the driver's window in approximately $^{25}/_{100}$ of a second (on average). The fastest times recorded by several research subjects in the same study was $^{15}/_{100}$ of a second. This is almost twice as fast as the average officer can pull the trigger of his own weapon, even set with his finger on the trigger and ready to fire.[142,143]

Other research reports that prone subjects – with their hands hidden beneath their body – can produce and fire a weapon from under their body in between ⅓ and ½ of a second.[144] Still other research illustrates that a typical individual in their early 20s can run 15 feet, and slash or stab an officer with a blade instrument in approximately 1 second.[145,146,147]

_In the instant case_.  The fact that neither Craft nor Jackson had been checked for weapons, coupled with Jackson's turtling of his hands and arms and his attempts to get up, created a dangerous situation for Billingslea and others. The danger was increased by Craft's maneuvering for position, and staying within a few feet of the officers, despite their commands to step back.

---

[140] Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? *The Police Marksman, 27*(6). 20-28.

[141] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

[142] Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? *The Police Marksman, 27*(6). 20-28.

[143] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

[144] Lewinski, W. J., Seefeldt, D., Redman, C., Gonin, M., Sargent, S., Dysterheft, J., & Thiem, P. (2016). The Speed of a Prone Subject. *Law Enforcement Executive Forum. 16*(1). 70-83.

[145] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

[146] Lewinski, W. J., Dysterheft, J. L., Seefeldt, D. A., & Pettitt, R. W. (2013). The influence of officer positioning on movement during a threatening traffic stop scenario. *Law Enforcement Executive Forum, 13*(1), 98-109.

[147] Lewinski, W. J., Hudson, B, & Dysterheft, J. L. (2014). Police officer reaction time to start and stop shooting: The influence of decision-making and pattern recognition. *Law Enforcement Executive Forum, 14*(2), 1-16.

---

11. COGNITION AND PERFORMANCE DURING STRESSFUL EVENTS.

Because of the tense, uncertain, and rapidly evolving, nature of the incident during the early morning hours of May 31, 2017, a discussion of underlying issues is in order.[148]

The Effect of Tense, Uncertain, and Rapidly Evolving Events.  While the phrase *"tense, uncertain, and rapidly evolving"*[149] is most often considered when discussing the justification for an officer's use of force, these same three dimensions are factors that impact the perception of officers and other individuals under stress, e.g., while being attacked, while waiting for the arrival of an ambulance or other emergency vehicle, or while watching or participating in an altercation or other high stress event.

Officers are trained, and know, that the more tense a situation is perceived to be; the greater the uncertainty of events or outcomes; and the more rapidly a situation seems to be unfolding – implying an increasing lack of control, or safety – the more an individual's perception of time and events can be distorted. Different stimuli and shifting situational factors impact how particular events are perceived. Despite their training, it is not uncommon for officers to experience many of the same effects as victims, witnesses, and other parties, in believing that events take much longer to occur than they actually do, or that they occur more quickly. In some cases, events seem to telescope in officers' minds, causing them to not enumerate some details of a stressful encounter when reporting or memorializing an incident.

This effect has long been well known among police trainers, as well as other emergency service professionals. It is often referred to as time distortion, or tachy-psyche effect.[150,151] Trainers and researchers recognize it as a normal, human reaction to stress, and a form of body alarm response, or alarm reaction.[152] Body alarm response is often colloquially referred to as fight-flight-freeze, or the fight-or-flight survival response.[153]

These time distortion effects are often seen when witnesses under- or overestimate how long an incident lasted, how long it took for an EMS vehicle to reach an injured party, or how long it took a particular individual to cover a certain distance or

---

[148] This discussion of underlying issues is intended to assist the reader with understanding some of the concepts that inform my opinions in this matter. They are a reflection of my applicable skills and knowledge, as gained through my experience, education, and training.

[149] *Graham v. Connor*, 490 U.S. 386, 396-7 (1989).

[150] Tachy-psyche effect, sometimes referred to as *tachypsychia,* is a neurological condition wherein a person's sense of time is distorted. Police trainers and other emergency services personnel know it as one of the most common effects of high-stress encounters and events.

[151] Nugent, Pam M.S. "Tachypsychia". *PsychologyDictionary.org*. April 13, 2013, https://psychologydictionary.org/tachypsychia/. Accessed by Steve Ashley on May 28, 2018.

[152] As defined by The American Heritage Medical Dictionary, 2007 ed., *"The initial stage in the body's response to stressful stimuli, characterized by adaptive physiological changes, such as increased hormonal activity and increased heart rate."*

[153] Other common manifestations of body alarm response are well known to law enforcement trainers and officers, and can include tunnel vision, auditory exclusion, loss of fine motor skills, and inaccurate memory of details.

perform a certain task, even when documented evidence to the contrary illustrates the correct distances or time frames.

_In the instant case._ The possible effects of tachypsychia can be seen in this incident, and may be reflected in Mr. Almasmary's confusion regarding the time sequence of events.[154]

A Note Regarding Variations in Officers' Accounts of Events.  There is some variation in the accounts of the officers, regarding the specific events at the convenience mart. This variation does not necessarily imply discrepancy or subterfuge; criminal justice trainers and managers have long understood that some variation is to be expected. In a quest for the most accurate accounting, this has led to a common – yet sometimes controversial – practice of delaying detailed reporting of critical incidents for one or sometimes two – or even three – sleep cycles, so as to allow for memory consolidation. A form of this approach is sanctioned by the International Association of Chiefs of Police.

Without reviewing every variation here, several general statements are relevant:[155]

- It is common for reports and recitations of details to become more fully developed during successive telling. This is often due to the nature of the questioning, and the time, energy, and motivation available to the reporting or testifying person.

- This phenomenon often results in details being stated out of order, or skipped altogether, until – in a later accounting – the questioner or the individual themselves discover the problem, and correct it.

- Accounts of the same event can be framed differently – sometimes even accounts by the same individual – based on the purpose of the report, statement, interview, or testimony. Internal Affairs detectives are often seeking different information than criminal investigators; probation officers are seeking different information for a pre-sentence report than a plaintiff's attorney taking a deposition. Depending on the nature and purpose of the accounting, different details are often pursued for different purposes. Comparing such statements can lead to an impression that they are different for some nefarious, conspiratorial reason.

In the final analysis, and as discussed in more detail herein, all accounts of any given occurrence derive from individuals that see events from different, unique perspectives.[156]

_In the instant case._ Billingslea and Patterson wrote their initial reports early in the morning following the events discussed here, without sleep or rest. Both officers began their duty shift at 6:45 pm[157] on 05/30/2017; they were scheduled to get off

---

[154] Video recording and transcript of the deposition of Mohammad Almasmary, dated 06/17/2019.

[155] Force Science Institute details reasons for delaying interviews with OIS survivors. _Force Science News_, _254_, p. 1-5. Retrieved from http://www.forcescience.org/fsnews/254.html. Accessed and retrieved by Steve Ashley on 19 September 2017.

[156] _Byther ex rel. Byther v. City of Mobile_, 398 F. Supp. 2d 1222, 1237 (S.D. Ala. 2005).

[157] 6:45 pm is equivalent to 1845 hrs.

duty at 3:00 am[158] on 05/31/2017.[159] Patterson's report was time-stamped at 0531[160] on 05/31/2017;[161] Billinglea's report was time-stamped 0459[162] on 05/31/2017.[163] Variances in the details of a stressful event, especially just a few hours afterward, and near the end of what amounts to an 11 hour shift, are not only likely – they are expected.

<u>Situational Awareness and Perceptual Narrowing</u>.  Body alarm response can affect an officer's – or anyone's – situational awareness.[164] Situational awareness is a term police and military trainers use to describe a personal safety trait, wherein individuals attempt to maintain awareness of all that is occurring around them, regardless of where their focus is.[165]

In the law enforcement profession, officers are trained that, while perfect situational awareness is something to strive for, it is not really attainable, especially under high levels of stress. It is more often the case that an officer's attention – or that of another person – will be narrowed, to a greater or lesser degree, on the focus of his or her attention, based upon the individual's perception of need or danger. This is commonly referred to in law enforcement as perceptual narrowing.[166]

Hence, an officer moving toward – or a citizen running away from – an emergency situation will sometimes pass other individuals without fully seeing them or even being aware of their existence.[167] The officer or other individual may develop tunnel vision on a specific item or threat – such as a weapon in the hand of an adversary – to the exclusion of things occurring in his peripheral vision.[168]

It is also common for individuals caught up in extremely stressful occurrences to experience another type of perceptual narrowing, an effect known as auditory exclusion.[169] When perceptual narrowing occurs, it's not uncommon for persons standing quite close to extremely loud sounds to be totally unaware of them, because they are so focused on the object of their concern, or on a particular goal, such as

---

[158] 3:00 am is equivalent to 0300 hrs.

[159] Detroit Police Department Activity Log of Richard Billinglea and Hakeem Patterson, dated 05/30/2017, MK000008–MK000009.

[160] 0531 hrs. is equivalent to 5:31 am.

[161] Detroit Police Use of Force or Detainee Injury Report of Officer Hakeem Patterson, CRISNET File Number 1705310034, dated 05/31/2017, p. 2.

[162] 0459 hrs. is equivalent to 4:59 am.

[163] Detroit Police Incident/Investigation Officer Narrative, Case Number 170531-0034, dated 05/31/2017, p. 4.

[164] Situational awareness has long been recognized in the military, medical, research, and law enforcement fields. It is one of the cornerstones of risk management.

[165] See, generally, Felter, B.A. (1988). *Police Defensive Handgun Use and Encounter Tactics*. New Jersey: Prentice-Hall.

[166] Artwohl, A. (2002, October). Perceptual and Memory Distortion During Officer-Involved Shootings. *FBI Law Enforcement Bulletin, 71*(10), 18-24.

[167] For a true-life, law enforcement example of this, see Chabris, C., & Simons, D. (2010). *the invisible gorilla: And Other Ways Our Intuitions Deceive Us*. New York: Crown.

[168] Klinger, D. (2004). Into the Kill Zone: A Cop's Eye View of Deadly Force. San Francisco: Josey-Bass.

[169] Auditory exclusion is sometimes referred to in the literature as *tunnel hearing*.

escape. This frequently manifests as the failure to hear yelling or screaming; or even normal conversation, when one is focused intently on another stimulus. Police officers often experience such auditory exclusion at the end of a traffic pursuit, or during a shooting, wherein they find themselves confronting a dangerous individual, or while they are standing close to vehicle sirens that are still blaring.[170]

Witnesses and suspects experience these effects as well. Officers know that it is common that witnesses to stressful events will often report very minute details about one specific aspect of a scene, a vehicle, or a weapon. Yet, those same witnesses will often be unable to relate even the most obvious elements of the same scene. They were so tunneled in on a very narrow focus, fixated on details, that macro elements of the same scene or event went completely unnoticed by them. Different people see the same scene from their own, unique, perspective.

Conversely, other witnesses or officers may remember events differently, or may not remember some details of the event at all. One example of this is well known to law enforcement professionals; frightened[171] or startled people often make mistakes in eyewitness identifications.

## 12. <span style="font-variant:small-caps">Risk Management in Law Enforcement Force and Control.</span>

Risk management can be defined as the weighing of alternatives based upon an informed assessment of an acceptable balance of risk versus reward. When viewed from that perspective, all of criminal justice is engaged in daily risk management. However, there is no part of law enforcement that is more sensitive to an acceptable balance of risk versus reward, than the use of force and control by police officers.

<u>Managing Force and/or Control Options</u>. Typically, once a police officer recognizes the need to take enforcement action or gain control of a situation, he – given time to do so – weighs the various alternatives available to him, and decides upon a course of action that is multi-dimensional in nature. However, one aspect of this decision-making process is particularly sensitive to a desirable outcome; the officer's selection of a force or control tool, technique, weapon, procedure, or methodology.

Ideally, the alternative selected should be effective in the short-term and generally safe to use (preferably for all concerned). But it should also be acceptable to those that will evaluate the outcome of the officer's actions.

Many force or control alternatives that appear safest to use are the least effective in the short-term, and many of the alternatives that are the most effective in the short-term are the least acceptable to those who would pass judgment on the outcome. Many of the options that an officer has for the use of control or force may appear – at least outwardly – to be inhumane and excessive, although research has shown that they may, in fact, be among the safer alternatives in terms of the potential for long

---

[170] Ross, D. L., & Siddle, B. K. (2003). An Analysis of the Effects of Survival Stress in Police Use-of-Force Encounters. *Law Enforcement Executive Forum, 3*(2).

[171] Wise, J. (2009). Extreme Fear: The Science of Your Mind in Danger. New York: Palgrave.

lasting or significant injury to the subject of the force or control, as well as to third parties and officers.[172,173]

This real-life risk management dilemma can be summed up succinctly, as *"the use of force [and control] is never pretty."*[174] Today, members of the public are exposed to police use of force and control as they have never been before. Officers must still make their risk management decision, however, as they undertake to use force and control in assisting a victim, managing a situation, pursuing a suspect, making an arrest, or protecting themselves and others.

When officers decide to use force or control, based on what they know and perceive at that moment, they are making a risk management decision.[175] They are balancing their perceived need for the application of force or control against their perceived negative outcome of not using that force or control. Often the decision is of lesser significance, with a fairly mild likely outcome. At other times, the decision the officer makes can – quite literally – result in life or death. Often, the life or death dependent upon the decision of the officer is his own, or that of the person he is trying to assist or control.

*In the instant case*. Unfortunately, sometimes the risk management decision is made for – instead of by – officers. In a situation like that reported at the convenience mart on May 31, 2017, events are compressed into a shorter period, resulting in less decision-making time. Michaele Jackson's aggressive resistance, and sudden attack left Officer Billingslea with few options, and very little time to choose. Still, Billingslea attempted lower levels of control – including empty-hand techniques and pepper spray – before resorting to a physical take down of Jackson.

Managing Risk Through Likely Outcomes. Another key element in an officer's decision-making process regarding escalation and de-escalation of force and control is his knowledge of the likely outcome of his actions. Officers are trained to base their decisions on what they understand the likely outcome to be, not whatever could possibly happen. In a world where circumstances can combine in unexpected and unpredictable ways, yielding an infinite number of possible results, it is impossible for officers to base their decisions on the avoidance of any possibility of a negative, unanticipated outcome.[176]

Instead, officers learn, from both their formal training and their experiences as officers, what the likely results of a particular action are. They are trained to then base their decisions on those likely outcomes.

Many of the same concerns attach to an officer's perception of the threat posed by the actions of other individuals. Officers are aware of the likelihood of injury posed by a

---

[172] Ho, J. D., Dawes, D. M., Lundin, E. J., & Miner, J. R. (2009). 127: Comparison of Acidosis Markers Associated with Law Enforcement Applications of Force. *Annals of Emergency Medicine, 54*(3), S40.

[173] Lundin, E. J., Dawes, D. M., Ho, J. D., Ryan, F.J., & Miner, J. R. (2009). 315: Catecholamines in Simulated Arrest Scenarios. *Annals of Emergency Medicine, 54*(3), S98-S99.

[174] Joyner, C. (2011). Advanced Concepts in Defensive Tactics: A Survival Guide for Law Enforcement. Boca Raton FL: CRC Press. 9.

[175] See, generally. Head, G. L. (1987). *Essentials of the Risk Management Process, Vol. 1 & 2*. Malvern PA: Insurance Institute.

[176] This reflects another central tenet of risk management: *One cannot manage away all risk*.

subject's perceived weapons and actions, but they are also mindful of the dearth of information they possess regarding a particular subject's capabilities, purpose, and intent, as well as the unpredictability of a mentally detached or substance-influenced subject. For that reason, when considering an unknown subject's risk factors, officers find themselves shifting their likelihood analysis further toward possible outcomes.

This understanding of likely outcomes facilitates law enforcement risk management in its purest form. It allows officers to make reasonable decisions regarding how to respond to perceived resistance by a suspect, while also reducing the potential for injury to themselves and others. They are trained – and know – that, in their wisdom, the courts do not expect them to be perfect, only to be reasonable in their decision-making.[177],[178] *"Officers are not required to use the least intrusive means available; they simply must act within the range of reasonable conduct."*[179] To hold them to any other standard would be to prevent them from ever taking action in the face of resistance or the need to control someone in order to help them.

*In the instant case.* In this case, Officer Billingslea had minimal time to consider options and outcomes. Attempting to wait in order to further discern a demonstrably aggressive and apparently intoxicated Michaele Jackson's intent would leave himself, his partners, and others in the area, at risk. Once Jackson punched him, Billingslea had minimal time to reassess the situation, and immediately moved to take Jackson into custody. Richard Billingslea's use of force actions were consistent with typical law enforcement training.

13. <u>USE OF FORCE AND CONTROL – GENERAL CONSIDERATIONS</u>.

<u>Perspective of a Reasonable Officer on the Scene</u>. Officers are trained – and know – that in determining whether or not a particular use of force or control was appropriate, and consistent with what other officers are likely to do under similar circumstances, one must view the event from the perspective of *"a reasonable officer on the scene."*[180] *"Perspective also is crucial to the analysis: '[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded.'"*[181]

<u>The Rashomon Effect</u>. In order to reach a satisfactory outcome to an encounter, officers bring their training, experience, skill sets, and education, with them as they begin an interaction with other individuals. When that interaction morphs into a situation wherein force or control may be necessary, an officer bases his decision-making on what he brought to the event, along with whatever information and sensory input he can absorb from his unique perspective in the moment.

Each officer's – and indeed each person's – perspective is different, and is constantly evolving as an event unfolds. Another person or another officer – even one located just a few feet (or even inches) away – is likely to see the event differently, based not

---

[177] *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990).

[178] *Dickerson v. McClellan*, 101 F3d 1151, 1160 (6 Cir. 1996).

[179] *Brooks v. City of Seattle*, 509 F.3d 1018, 1025 (9 Cir. 2010).

[180] *Graham*, 396.

[181] *Jean-Baptiste*, 816, citing *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11 Cir. 2009).

only on their physical relationship to the event, but also on their own unique set of filters;[182] education, experience, training, or emotional attachment. This tendency to perceive events differently due to a difference in perspective is known as the Rashomon Effect, or the Rashomon Principle.[183]

If asked for a value judgment, individuals are likely to have very different assessments of the need or justification for certain actions, based on their own unique perspective. However – particularly in use of force situations – officers are trained that an officer's actions *"must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."*[184,185]

Officers understand that *"[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."*[186]

Often the facts of a particular encounter give rise to some debate regarding whether an officer's use of force in a specific situation met the criteria suggested by his or her department's particular procedural guideline. In such cases, it's important to remember that, in fact, since at least 1979, the courts have taken the position that *"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."*[187,188]

<u>*In the instant case.*</u> Whether an officer made correct or appropriate decisions during an encounter is often debated *ad nauseam*, after the fact, and with the luxury of time, by individuals who did not see rapidly evolving events through the eyes – and from the perspective – of that officer. However – as is often the case – during the rapidly evolving events of May 31, 2017, Officer Billingslea had very little time to react to what he knew to be an aggressive, resistant, probably intoxicated individual.

14. <u>ANALYSIS.</u>

<u>Analysis Context</u>. The following analyses of officer actions in the incident described, *supra*, are undertaken through application of commonly understood training and procedural criteria as they are presented and utilized throughout the law enforcement community. Utilization of specific terminology – including any legal terminology – is intended to clarify the relationship between this analysis and a broader criminal

---

[182] Green, M., et al. (2008). *Forensic Vision with Application to Highway Safety (3rd ed.)*. Tucson: Lawyers & Judges Publishing.

[183] Heider, K. G. (1988). The Rashomon Effect: When Ethnographers Disagree. *American Anthropologist, New Series, 90*(1), 73-81.

[184] *Graham*, 396.

[185] Even a video camera will not capture things from an officer's perspective, and with the perceptual context the officer has in the moment. The camera may capture some – or arguably, even most – of the *what* that is in front of the lens. However, it's unlikely that any camera can really capture the *why* that controls the officer's perception of the need to take a certain course of action; in this case, deciding on a particular level of force, or selection of a particular implement or technique for effecting control of the situation.

[186] *Long v. Slaton*, 508 F.3d 576, 581 (11 Cir. 2007).

[187] *Graham*, 396, citing *Bell v. Wolfish*, 441 U.S., 559.

[188] *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

justice training, policy, and procedural context.[189,190] In effect, this analysis is cast as a contextual application of typical law enforcement training.

<u>Use of Force by Officers – Generally</u>. Officers are trained – and know – that if, when acting in their governmental capacity, they intentionally terminate someone's freedom of movement, they are presumed to have effected a seizure,[191] and that their use of force during a stop or an arrest is also a seizure,[192] and is therefore evaluated from the perspective of the Fourth Amendment[193] to the United States Constitution.[194] Officers are also trained, and know, that the United States Supreme Court outlined a Constitutional construct for reviewing government use of force, in the 1989 case, *Graham v. Connor*.[195]

<u>Use of Force Under *Graham v. Connor*</u>. Reasonable law enforcement officers are trained – and know – that whether or not a particular use of force application was objectively reasonable[196] under the Fourth Amendment is based upon an analysis of that use of force in light of three factors, among others:[197]

- *"whether the suspect poses an immediate threat to the safety of the officers or others";*

- *"whether he is actively resisting arrest or attempting to evade arrest by flight";*

- *"the severity of the crime at issue".*[198]

Reasonable officers are trained – and know – that in applying these criteria, the U. S. Supreme Court reiterated its earlier statement in *Bell v. Wolfish,*[199] that the *"test*

---

[189] As stated, *supra*, use of such terminology is not intended to subvert the function of the Court, or to inappropriately influence the role of the jury or other trier of fact.

[190] Any discussion of case law reflects what I, as well as many – perhaps most – other law enforcement use of force trainers, have been researching, analyzing, and teaching, for many years. As is common practice throughout the law enforcement community, when this material is taught to officers, it is framed from an informed lay-person's perspective, with the goal of having officers understand the practical application of the criteria that courts will generally hold them to, based on existing case law. This methodology is widely utilized in the law enforcement training community, and is geared to inculcate in officers a deeper appreciation and understanding of the rationale applied when use of force and/or control incidents are reviewed for justification.

[191] *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989).

[192] *Tennessee v. Garner,* 471 U.S. 1 (1985).

[193] U.S. Const. amend. IV.

[194] *Graham,* 388.

[195] *Graham v. Connor*, 490 U.S. 386 (1989).

[196] See generally, *Graham v. Connor*, 490 U.S. 386 (1989).

[197] Officers are trained that, while the *Graham* Court did not specify a particular hierarchy of importance for these factors, the Ninth Circuit – and other courts – have; perhaps most notably in the case *Chew v. Gates*, 27 F.3d 1432 (9 Cir. 1994), cert. denied, (U.S. Feb. 21,1995)(No. 94-980). This ordering of factors is commonly taught and emphasized in law enforcement use of force training, as well as in procedural guidelines. Thus, these factors are listed here in the order of importance seemingly considered by *Graham's* progeny.

[198] *Graham*, 396.

[199] *Bell v. Wolfish*, 441 U.S. 520 (1979).

*of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.*"[200] Reasonable officers are also trained – and know – that this analysis is properly conducted "*from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight*"[201] and is properly analyzed in light of the *"totality of the circumstances"*[202] facing the officer. Reasonable officers are further trained – and know – that, when reviewing the above (and other) factors, courts will consider the degree to which a given situation is "*tense, uncertain, and rapidly evolving*"[203] when assessing the reasonableness of a particular use of force.

<u>Application of the *Graham* Factors to Billingslea's Use of Force</u>. With respect to the individual *Graham* factors, and without reiterating all the incident information discussed, *supra*:

- *Immediacy of the threat*. The immediate threat posed by Michaele Jackson was that he was behaving irrationally and appeared to be intoxicated. Billingslea perceived that Jackson had assaulted him twice, once at the door to the convenience mart and once when Jackson violently punched him.

- *Actively resisting arrest*. Michaele Jackson actively and aggressively resisted arrest for several minutes.

- *Attempting to evade arrest by flight*. While Jackson continued to move away from Billingslea, it does not appear that he was attempting to flee.

  Still, even if Jackson was not attempting to escape, it was not illogical for Billingslea to believe he was, due to his constant movement. And – as stated by the Fifth Circuit in Rockwell – *"… neither the Supreme Court nor this Court has ever held that **all** of the Graham factors must be present for an officer's actions to be reasonable; indeed, in the typical case, it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer or others."*[204] [emphasis in original]

- *Severity of the crime at issue*. The severity of Michaele Jackson's reported crime was significant. When Billingslea was violently assaulted by Jackson punching him during his aggressive resistance, he [Billingslea] believed that act constituted a violent felony.[205]

- *Tense, uncertain and rapidly evolving*. Finally, regarding Officer Richard Billingslea's altercation with Michaele Jackson, the situation was tense, uncertain, and rapidly evolving. Consider that:

---

[200] *Graham*, 396, citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

[201] *Graham*, 396.

[202] *Graham*, 396, citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985).

[203] *Graham*, 396-7.

[204] *Rockwell v. Brown*, 664 F.3d 985, 992 (5 Cir. 2011).

[205] MCL § 750.81d(1) states, in pertinent part, *"…an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both."*

- *The situation was tense*, in that, as the incident began, Billingslea and Patterson were faced with two individuals, one of whom was unknown to Billingslea, appeared to be behaving irrationally, and was possibly intoxicated.

- *The situation was uncertain*, in that Billingslea did not know why Jackson was acting as he did, or how under the influence Jackson was. He did know that he (Billingslea) had been assaulted by an individual that was actively and aggressively resisting arrest, and had punched Billingslea during his continuing resistance.

- *The situation was rapidly evolving*, in that, once the incident began, the entire use of force unfolded very aggressively: One moment, Billingslea was watching D'Marco Craft walk to his car following a verbal exchange; the next moment he was assaulted by an unknown, possibly intoxicated, individual, followed moments later by the same individual assaulting him again by punching him during his continued, aggressive resistance.

<u>Consideration of Time and the Selection of Options</u>. Although officers may sometimes have various courses of action open to them, and multiple use of force or control options for dealing with an individual, they often do not have time to study a situation in order to make a fully informed decision regarding which option to choose.

Officers may approach a given situation with limited information, or without adequate time to analyze circumstances in detail. In those cases, officers often need to *"make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving."*[206] In such a moment, officers will choose force or control options based on their perception of need or danger, and predicated on their assessment of the likely outcome of the option's use. This decision is sometimes complicated by the relative ineffectiveness – or even the inadvisability – of different options, given the circumstances facing the officer.[207,208]

Perhaps the most critical dimension that affects an officer's choice of force or control option is that of time. Officers are trained that time often equals safety, and that – generally speaking – one of the clearest manifestations of time-as-safety is that of distance. Principally, this is reflected in officers' understanding that, the closer you are to an adversary, the less time you will have to react to a sudden attack. This concept is referred to as *reactionary gap*.[209] Officers are trained to create distance, if time and the environment allows. When they cannot do so, officers are acculturated to be hyper-sensitive to threat cues presented by the individual, or by the environment,

---

[206] See generally, *Graham v. Connor*, 490 U.S. 386, 397 (1989).

[207] Many force and control options fail under differing conditions. Even TASER electrical weapons – one of the most effective, non-lethal options officers have – do not work to control resistive behavior every time they are deployed. Some studies have indicated that their effectiveness rate can be as low as 50-60 percent, given circumstances at the time of their deployment.

[208] Mesloh, C., Wolf, R., Henych, M., & Thompson, F. (2008). Less Lethal Weapons for Law Enforcement: A Performance-Based Analysis. *Law Enforcement Executive Forum. 8*(1).

[209] Reactionary gap has been defined as a range of distances, based upon the context of the encounter. Distances of 6 – 8 feet are frequently cited as the minimum acceptable for safety; although, depending on the weapon or tactics chosen by an adversary, ranges of 21 feet and beyond are not uncommon.

including the urgency of any expeditious resolution. Additionally, when they cannot create distance, officers are actually trained to close the distance quickly, to – in effect – shorten their adversaries' reaction time. Plainly stated; if an officer can't move back safely, they are trained to move in quickly. This maneuver is referred to as *penetrating the gap*.[210]

*In the instant case*. As the incident at the convenience mart began to unfold, Officer Billingslea had to adjust very quickly. Because Billingslea had determined to take Jackson into custody, he – of necessity – moved in closer to Jackson. This increased Billingslea's risk exposure, as he was well within Jackson's arm's reach. In effect, when Jackson suddenly turned to face him, Billingslea was caught inside the reactionary gap, at a point that law enforcement use of force trainers have long referred to as the *inside position*.[211]

The Importance of Perspective. When officers are engaged in a physical control situation, it is they who are in the best position to assess the level of resistance or difficulty they are encountering. An individual reviewing an officer's actions after the fact and conducting a detailed analysis, is sometimes tempted to apply his own reasoning, criticisms, and conclusions – *ipse dixit* – to the actions of that officer. It is easy to fall into this hindsight trap, yet the courts have steadfastly cautioned against it.[212]

The twin luxuries of time and hindsight may make such an application seem logical and appropriate. However, officers are usually closest to the action – often in direct, physical, contact with the subject – and their perspective is likely to be different than that of a dispassionate reviewer or even a close-by observer.

When engaged in a physical control situation, officers combine what knowledge they already have, with the information and feedback gained in the midst of the moment.[213] In fact, they view events through the prism of context. Context is key, particularly as it relates to vision. Vision is highly context dependent.[214] Someone else may see part or all – relatively speaking – of a series of events, but because their context is different, their perspective will often yield a different evaluation of the circumstances and outcome.

When an officer views a sequence of events through his highly personalized prism of context, the result is each officer's unique perspective regarding the totality of the circumstances they are dealing with.

In the aftermath of an incident, it is common for a subject or witness to allege that officers were not threatened, that there was no intent to harm officers, that the witness

---

[210] Siddle, B. K. (2005). *PPCT Defensive Tactics Student Manual – Michigan edition*. Belleville IL: PPCT Management Systems.

[211] Siddle, B. K. (2004). *PPCT Defensive Tactics Instructor Manual – United States edition*. Belleville IL: PPCT Management Systems.

[212] *Penley v. Eslinger*, 605 F.3d 843 (11 Cir. 2010).

[213] Artwohl, A., & Christensen, L. W. (1997). Deadly Force Encounters: What Cops Need to Know to Mentally and Physically Prepare for and Survive a Gunfight. Boulder CO: Paladin Press.

[214] Green, M., et al. (2008). *Forensic Vision with Application to Highway Safety (3rd ed.)*. Tucson: Lawyers & Judges Publishing.

saw no aggressive behavior on the part of an individual, or that officers' actions were unnecessary. However, the intent of a subject is not something an arresting, controlling, or pursuing, officer can know. Officers base their responses to perceived resistance on the behavior of subjects, and what that behavior conveys as a subject's likely intent, as officers perceive it in the moment. Officers learn through both training and experience to react to pattern-recognition of threat or movement cues, as they manifest in an individual's observed behavior.[215] Those cues provide the basis for an officer's perception of resistance or lack of control, and thus, danger.[216]

The Necessity for or Reasonableness of Force and Control. Officers are trained – and know – that they need not use the least amount of force necessary,[217,218] a quantity they can never effectively measure before the fact. Officers are trained – and know – that they are *"entitled to continue his use of force until a suspect thought to be armed is 'fully secured.'"*[219]

In fact, reasonable officers are trained, and know, that they *"…are not required to use the least intrusive degree of force possible. Rather […] the inquiry is whether the force that was used to effect a particular seizure was reasonable, viewing the facts from the perspective of a reasonable officer on the scene."*[220] And, they are trained that their use of force must be objectively reasonable under the totality of circumstances they encounter in a given situation.

*In the instant case.* The degree of escalating risk to Officer Richard Billingslea – and others – posed by Michaele Jackson's violent, dogged, resistance and aggressive actions, Billingslea's lack of knowledge regarding who he was dealing with and what was happening, Jackson's apparent intoxication and irrational behavior, the immediacy of the threat posed by Jackson once Jackson punched Billingslea, and Billingslea's concern for the well-being of himself and his fellow officers (especially in light of D'Marco Craft's distracting influence), all clearly combined to present Officer Richard Billingslea with a *totality of the circumstances* worthy of consideration.

## 15. OPINIONS.

Based on the items outlined above, as well as my general understanding of the case, I hold the following opinions, each to a reasonable – or higher – degree of professional certainty. These opinions are in addition to any statements of opinion I may have included, *supra*.

---

[215] (2011). *Stress and Decision Making*. Federal Law Enforcement Training Center.

[216] The Fifth Circuit stated in *Harris v. Serpas*, 745 F.3d 767, 773 (2014) citing *Rockwell*, 664 F.3d at 991, "The relevant law, however, does not require the court to determine whether an officer was in actual, imminent danger of serious injury, but rather, whether "the officer reasonably believe[d] that the suspect pose[d] a threat of serious harm to the officer or to others.""

[217] As eloquently stated by Judge Tallman in his dissent, *Bryan v. MacPherson*, 630 F.3d 805, 818 (9 Cir. 2010).

[218] *Forrester v. City of San Diego*, 25 F.3d 804 (9 Cir. 1994).

[219] *Jean-Baptiste*, 821, citing *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11 Cir. 2009).

[220] *Forrester*, 808.

1.  It is my opinion that <u>the use of force and control by Detroit Police Officer Richard Billingslea, was based upon his perception that Michaele Jackson had assaulted him [Billingslea], had refused to comply with commands, and that he then physically resisted Billingslea's attempts to gain compliance</u> and control.

2.  It is my opinion that trained and experienced officers are likely to logically conclude that <u>the reported actions of Michaele Jackson posed a threat or risk of serious injury or death to officers and others in the area.</u>

3.  Further, it is my opinion that police officers who do so conclude, would likely determine that <u>it was necessary to use force and control methods</u> in order for Billingslea to reduce the likelihood of serious injury or death to himself <u>and that it would be logical and appropriate for them to reach that conclusion, considering their training and experience</u>.

4.  It is also my opinion that it is logical and appropriate to conclude that <u>many of those officers</u>, when faced with the same – or a substantially similar – situation as that reported by Officer Billingslea, <u>would likely act in the same, or a similar, way as he did</u>.

5.  It is my opinion that, if similarly trained and experienced, and faced with the same or similar reported circumstances, <u>other reasonable police officers would believe that the conduct and actions of Officer Billingslea were lawful</u> in placing Michaele Jackson under arrest for assault, and resisting arrest.

6.  It is my opinion that, if similarly trained and experienced, and faced with the same or similar reported circumstances, <u>other reasonable police officers would believe that the conduct and actions of Officer Billingslea were lawful</u> in using what force and control methods he did in his attempt to arrest and control Michaele Jackson.

7.  It is my opinion that, if similarly trained and experienced, and faced with the same or similar reported circumstances, <u>other reasonable police officers would believe that the conduct and actions of Officer Billingslea were lawful</u> in preventing Craft and/or Jackson from entering the convenience mart, while the other remained outside, thereby splitting the attention of the two officers, and putting them in a tactically disadvantageous situation, contrary to typical officer safety training and protocols.

8.  It is my opinion that Officer <u>Billingslea's perceptions regarding the use of force were consistent with known human factors research</u>.

9.  It is my opinion that <u>the later actions of Officer Billingslea regarding medical treatment for Michaele Jackson following the encounter were logical and appropriate, given the circumstances</u>.

## 16. COMPENSATION FOR STUDY AND TESTIMONY.

<u>Compensation for Study, Analysis, Testimony, and Travel</u>. In addition to reasonable and customary reimbursement for expenses, I am compensated at a rate of $150.00 per hour for study, review, research, analysis, and report preparation. I am

compensated at a rate of $200.00 per hour for testimony. My rate of compensation for travel is $75.00 per hour.[221]

<u>Compensation as of this Writing</u>. As of this writing, I have not received any compensation for my services in this matter.

As is my usual practice, my fees are not dependent upon my findings, or on the outcome of any legal action, mediation, arbitration, or the amount or terms of any settlement of any underlying cause, nor upon any contractual arrangement between defense or plaintiff's counsel and any other person or party.

## 17. <u>EXHIBITS</u>.

The following exhibits are attached, and are to be considered part of this report.[222]

- <u>Exhibit I</u> is a list of documents and materials that I have reviewed or considered during the completion of this report.

- <u>Exhibit II</u> is my Curriculum Vitae, which includes a list of publications that I have authored or coauthored in the last ten years.

- <u>Exhibit III</u> is a listing of cases in which I have testified as an expert at deposition, hearing, or trial, in the last four years.

- <u>Exhibit IV</u> is my complete Fee Schedule.

<table>
<tr><td>_____ August 22, 2019 _____<br><small>DATE</small></td><td>_____<br><small>STEVEN D. ASHLEY, MSc, MLS, ARM/P, AFSS, INCI</small><br><small>MONROE, MICHIGAN</small></td></tr>
</table>

---

[221] My detailed Fee Schedule is attached as <u>Exhibit IV</u>.

[222] In the electronic version of this report, each can be accessed directly by clicking on the underlined exhibit number.

# EXHIBIT I – DOCUMENT LIST

**Last Reviewed/Updated August 22, 2019**

The following items were considered, reviewed, recalled, or referenced, by me during my analysis of this case and the development of this report. Some were provided by counsel, while others are the product of my research and/or consideration.

## DOCUMENTS

1.  Plaintiffs' Third Amended Complaint, Case Number 17-cv-12752, Document Number 72, PageID.920-PageID.965, Filed 01/30/2019.

2.  Defendant's Initial Disclosures with listed attachments, dated 01/02/2018.

    2.1.  Detroit Police Use of Force or Detainee Injury Report of Officer Hakeem Patterson, CRISNET File Number 1705310034, dated 05/31/2017.

    2.2.  Detroit Police Use of Force or Detainee Injury Report of Officer Richard Billingslea, CRISNET File Number 1705310034, dated 05/31/2017.

    2.3.  Detroit Police Incident/Investigation Report, Case Number 170531-0034, dated 05/31/2017.

    2.4.  Detroit Police Incident Report Suspect List, Case Number 170531-0034, dated 05/31/2017.

    2.5.  Detroit Police Incident Report Related Property List, Case Number 170531-0034, dated 05/31/2017.

    2.6.  Detroit Police Incident/Investigation Officer Narrative, Case Number 170531-0034, dated 05/31/2017.

    2.7.  Detroit Police Daily Detail for 5th Precinct, Platoon 4, dated 05/31/2017.

    2.8.  Detroit Police Desk Blotter Report for 5th Precinct, Platoon 1, dated 05/30/2017.

    2.9.  DPD Employee Profile of PO Richard Billingslea, undated.

    2.10.  DPD Employee Profile of PO Hakeem Patterson, undated.

    2.11.  Detroit Police Department Manual, Section 101.11 *Record Retention Schedule* [one page only], dated 2014, Page 10 of 14.

    2.12.  Detroit Police Department Activity Log of Officers Yossif Mana, Hakeem Patterson, and Richard Billingslea, dated 04/27/2016.

    2.13.  Detroit Police Department Activity Log of Officers Moreland and Collins (sic), marked 1 of 2, dated 10/09/2015.

    2.14.  Detroit Police Department Activity Log of Officers Moreland and Collins (sic), marked 2 of 2, dated 10/09/2015.

    2.15.  Detroit Police Department Activity Log of Officers Glenn Bines and Antoine Hill, dated 03/14/2017.

2.16.    Detroit Police Department Activity Log of Officers David Mays II and Yossif Mana, dated 03/14/2017.

2.17.    Detroit Police Incident/Investigation Report, Case Number 170315-0003, dated 03/15/2017.

2.18.    Detroit Police Department Reporting Officer Narrative of Officers Mana and Mays, Case Number 170315-0003, dated 03/15/2017.

2.19.    Detroit Police Incident Report Suspect List, Case Number 170315-0003, undated.

2.20.    Photocopy of cover of Detainee File Folder of D'Marco Craft, undated.

2.21.    Detroit Police Detainee Input Sheet of D'Marco Craft, CRISNET Number 1703150003, dated 03/15/2017.

2.22.    Detroit Police Department Mugshot Report of D'Marco Craft, dated 03/15/2017.

2.23.    Detroit Police Impounded Vehicle form, dated 03/15/2017.

2.24.    Detroit Police Department Activity Log of Officers Glenn Bines and Antoine Hill, dated 03/14/2017.

2.25.    Detroit Police Department Activity Log of Officers Moreland and Collins (sic), marked 1 of 2, dated 10/09/2015.

2.26.    Detroit Police Department Activity Log of Officers Moreland and Collins (sic), marked 2 of 2, dated 10/09/2015.

2.27.    Detroit Police Department Activity Log of Officers Yossif Mana, Hakeem Patterson, and Richard Billingslea, dated 04/27/2016.

2.28.    Detroit Police Department Activity Log of Officers David Mays II and Yossif Mana, dated 03/14/2017.

2.29.    Photocopy of cover of Detainee File Folder of D'Marco Craft, undated.

2.30.    Detroit Police Detainee Input Sheet of D'Marco Craft, CRISNET Number 1703150003, dated 03/15/2017.

2.31.    Detroit Police Department Mugshot Report of D'Marco Craft, dated 03/15/2017.

2.32.    Detroit Police Impounded Vehicle form, dated 03/15/2017.

2.33.    Detroit Police Incident/Investigation Report, Case Number 170315-0003, dated 03/15/2017.

2.34.    Detroit Police Department Reporting Officer Narrative of Officers Mana and Mays, Case Number 170315-0003, dated 03/15/2017.

2.35.    Detroit Police Incident Report Suspect List, Case Number 170315-0003, undated.

3.    Detroit Police Department Activity Log of Sergeant Randall Craig, dated 05/30/2017, MK000002–MK000003.

4.     Detroit Police Department Activity Log of Glenn Bines, Naim Brown, and Antoine Hill, dated 05/30/2017, MK000004–MK000005.

5.     Detroit Police Department Activity Log of Michael Bailey and Yossif Mana, dated 05/30/2017, MK000006–MK000007.

6.     Detroit Police Department Activity Log of Richard Billingslea and Hakeem Patterson, dated 05/30/2017, MK000008–MK000009.

7.     Video Files.

    7.1.     Video file titled *Camera 1.mp4*, [length 00:15:39], UTC encode date 05/31/2017.

    7.2.     Video file titled *Camera 2.mp4*, [length 00:16:20], UTC encode date 05/31/2017.

    7.3.     Video file titled *Camera 3.mp4*, [length 00:19:04], UTC encode date 05/31/2017.

    7.4.     Video file titled *Camera 4.mp4*, [length 00:15:55], UTC encode date 05/31/2017.

    7.5.     Video file titled *Camera 5.mp4*, [length 00:15:31], UTC encode date 05/31/2017.

    7.6.     Video file titled *Camera 9.mp4*, [length 00:16:34], UTC encode date 05/31/2017.

    7.7.     Video file titled *Composite- Gas Station Surveillance Video.mp4*, [length 00:15:24], UTC encode date 05/31/2017.

    7.8.     Video file titled *Naim Brown's Body-Camera Video.mp4*, [length 00:29:35], no encode date.

    7.9.     Video file titled *Craft's Cell Phone Video.MOV*, [length 00:03:02], UTC encode date 05/31/2017.

    7.10.   Video file titled *GLENNBINES054_201705310212_WFC1008671_ 14707342.mp4*, [length 00:0:03], no encode date.

    7.11.   Video file titled *MICHAELBAILEY811_201705310137_WFC100 8600_14666645.mp4*, [length 00:18:08], no encode date.

    7.12.   Video file titled *NAIMBROWN842_201705310134_WFC1008651_ 14707467.mp4*, [length 00:29:35], no encode date.

    7.13.   Video file titled *RICHARDBILLINGSLEA578_201705310133_WFC 1008769_14797676.mp4*, [length 00:21:16], no encode date.

    7.14.   Video file titled *YOSSIFMANA062_201705310136_133805_ 194003392.mp4*, [length 00:26:56], no encode date.

    7.15.   Video file titled *YOSSIFMANA062_201705310137_WFC1008664_ 14722557.mp4*, [length 00:08:58], no encode date.

8.     Deposition transcript of Richard Billingslea, dated 06/07/2019, with attached exhibits:

8.1. Detroit Police Use of Force or Detainee Report of Richard Billingslea, CRISNET File Number 1705310034, [marked *Exhibit #5*], dated 05/31/2017.

8.2. Detroit Police Incident/Investigation Report of Officer Richard Billingslea, Case Number 170531-0034, [marked *Exhibit #6*], dated 05/31/2017.

8.3. Detroit Police Department Desk Blotter Report for 5th Precinct, Platoon 1, [marked *Exhibit #7*], dated 05/30/2017.

9. Deposition transcript of D'Marco Craft, dated 06/11/2019, with attached exhibit:

   9.1. Deposition Notice, [marked *Exhibit Craft A*], dated 06/11/2019.

10. Deposition transcript of Glenn Bines, dated 06/07/2019.

11. Deposition transcript of Michaele Jackson Jr., dated 06/21/2019, with attached exhibits:

    11.1. Deposition Notice, [marked *Exhibit Jackson #1*], dated 06/21/2019.

    11.2. Color Photograph, [marked *Exhibit Jackson #2*], dated 06/21/2019.

    11.3. Color Photograph, [marked *Exhibit Jackson #3*], dated 06/21/2019.

    11.4. Color Photograph, [marked *Exhibit Jackson #4*], dated 06/21/2019.

    11.5. Color Photograph, [marked *Exhibit Jackson #5*], dated 06/21/2019.

    11.6. Color Photograph, [marked *Exhibit Jackson #6*], dated 06/21/2019.

12. Deposition transcript of Hakeem Patterson, dated 06/07/2019, with attached exhibits:

    12.1. Color Photograph, [marked *Exhibit #1*], dated 06/07/2019.

    12.2. Detroit Police Department Activity Log [one page only], [marked *Exhibit #2*], dated 06/07/2019.

    12.3. Video File titled *Patterson Exhibit 3.mp4*, [length 00:00:17], no encode date.

    12.4. Detroit Police Use of Force or Detainee Injury Report of Hakeem Patterson, CRISNET File Number 1705310034, [marked *Exhibit #4*], dated 05/31/2017.

13. Deposition transcript of Antoine Hill, dated 05/31/2019, with attached exhibit:

    13.1. Detroit Police Department Activity Log [one page only], [purportedly marked *Exhibit 2* (sticker is illegible)], unknown date.

14. Deposition transcript of Bryan Moore, dated 05/29/2019.

15. Deposition transcript of David Mays, II, dated 05/31/2019.

16. Deposition transcript of Michael Bailey, dated 05/29/2019.

17. Deposition transcript of Naim Brown, dated 05/31/2019.

18. Deposition transcript of Randall Craig, dated 04/29/2019.

19. Deposition transcript of Yossif Mana, dated 05/31/2019.

20. Video recording and transcript of the deposition of Mohammad Almasmary, dated 06/17/2019.

21. "Weather for Coleman A. Young Airport, Detroit, MI for May 31, 2017". Weather Underground, 31 May 2017, https://www.wunderground.com/history/daily/us/mi/detroit/KDET/date/2017-5-31. Accessed and retrieved by Steve Ashley on 8 July 2019.

22. "Weather for Coleman A. Young Airport, Detroit, MI for May 30, 2017". Weather Underground, 30 May 2017, https://www.wunderground.com/history/daily/us/mi/detroit/KDET/date/2017-5-30. Accessed and retrieved by Steve Ashley on 8 July 2019.

23. "Sun and Moon Data for One Day for Wednesday, May 31, 2017"; U.S. Naval Observatory Astronomical Applications Department; https://aa.usno.navy.mil/rstt/onedaytable?ID=AA&year=2017&month=5&day=31&state=MI&place=Detroit. Accessed and retrieved by Steve Ashley on 8 July 2019.

24. Additional PACER Documents, case 2:17-cv-12752-GAD-MKM.

  24.1. Defendants' Preliminary Witness List, Document 67, date filed 12/17/2018, PageID.841–847, with attachment:

    24.1.1. Curriculum Vitae of Steven D. Ashley, [dated 07/23/2011], Document 67-1, date filed 12/17/2018, PageID.848–862.

  24.2. Plaintiffs' Initial Witness List, Document 68, date filed 01/02/2019, PageID.863–868.

  24.3. Richard Billingslea's Answer to Plaintiffs' Third Amended Complaint, Reliance Upon Jury Demand, Special and Affirmative Defenses, and Demand for Reply, Document 84, date filed 03/04/2019, PageID.1311–1355.

  24.4. Plaintiffs' Reply to Defendant Richard Billingslea's Special and Afrirmative [sic] Defenses, ECF #84, Document 95, date filed 03/13/2019, PageID.1482–1485.

  24.5. Order Granting Attorney Gregory B. Paddison's Motion to Withdraw as Counsel for Defendant Richard Billingslea [#100], Granting Defendants' Motion to Extend Discovery and Dispositive Motion Cut-Off Dates [#106], and Amending Scheduling Order, Document 121, date filed 05/22/2019, PageID.2070–2071.

  24.6. Defendants, City of Detroit, Hakeem J. Patterson, Yossif Mana, Antoine Hill, Glenn Bines, David Mays, II, Naim Brown, Michael Bailey, Randall Craig, and Bryan Moore's First Supplemental Witness List, Document 138, date filed 08/05/2019, PageID.2673–2680.

  24.7. "Corrected" Brief in Support of Defendant Richard Billingslea's Motion for Summary Judgment, Document 151, date filed 08/19/2019, PageID.5119–5157.

25.   Defendants, City of Detroit, Hakeem J. Patterson, Yossif Mana,  Antoine Hill, Glenn Bines, David Mays, II, Naim Brown, Michael Bailey, Randall Craig, and Bryan Moore's Expert Disclosure for Timothy K. McGuckin, with attachments:

    25.1.   Cover letter from Seward Henderson PLLC to Solomon M. Radner. Esq., dated 08/20/2019.

    25.2.   Exhibit 1, Expert Report of Defense Purported Expert Timothy K. McGuckin, dated 08/16/2019, with incorporated attachment:

        25.2.1.     Michigan Penal Code §750.81d.

    25.3.   Exhibit 2, Expert Witness Compensation Schedule, undated.

## REFERENCES

(2007). *American Heritage Medical Dictionary*. Boston: Houghton Mifflin Company.

Artwohl, A. (2002, October). Perceptual and Memory Distortion During Officer-Involved Shootings. *FBI Law Enforcement Bulletin, 71*(10), 18-24.

Artwohl, A., & Christensen, L. W. (1997). *Deadly Force Encounters: What Cops Need to Know to Mentally and Physically Prepare for and Survive a Gunfight*. Boulder CO: Paladin Press.

Chabris, C., & Simons, D. (2010). *the invisible gorilla: And Other Ways Our Intuitions Deceive Us*. New York: Crown.

Fed. R. Evid. 702.

Felter, B.A. (1988). Police Defensive Handgun Use and Encounter Tactics. New Jersey: Prentice-Hall.

Force Science Institute details reasons for delaying interviews with OIS survivors. *Force Science News*, *254*, p. 1-5. Retrieved from http://www.forcescience.org/fsnews/254.html. Accessed and retrieved by Steve Ashley on 19 September 2017

Green, M., et al. (2008). *Forensic Vision with Application to Highway Safety (3rd ed.)*. Tucson: Lawyers & Judges Publishing.

Head, G. L. (1987). *Essentials of the Risk Management Process, Vol. 1 & 2*. Malvern PA: Insurance Institute.

Heider, K. G. (1988). The Rashomon Effect: When Ethnographers Disagree. *American Anthropologist, New Series, 90*(1), 73-81.

Ho, J. D., Dawes, D. M., Lundin, E. J., & Miner, J. R. (2009). 127: Comparison of Acidosis Markers Associated with Law Enforcement Applications of Force. *Annals of Emergency Medicine, 54*(3), S40.

Jennett, S. (Ed.). (2008). *Churchill Livingstone's Dictionary of Sport and Exercise Science and Medicine*. New York: Elsevier Limited.

Joyner, C. (2011). *Advanced Concepts in Defensive Tactics: A Survival Guide for Law Enforcement*. Boca Raton FL: CRC Press.

Klinger, D. (2004). *Into the Kill Zone: A Cop's Eye View of Deadly Force*. San Francisco: Josey-Bass.

Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? *The Police Marksman, 27*(6). 20-28.

Lewinski, W. J., Hudson, B., & Dysterheft, J. L. (2014). Police officer reaction time to start and stop shooting: The influence of decision-making and pattern recognition. *Law Enforcement Executive Forum*, *14*(2), 1-16.

Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

Lewinski, W. J., Dysterheft, J. L., Seefeldt, D. A., & Pettitt, R. W. (2013). The influence of officer positioning on movement during a threatening traffic stop scenario. *Law Enforcement Executive Forum*, *13*(1), 98-109.

Lewinski, W. J., & Redmann, C. (2009). New Developments in Understanding the Behavioral Science Factors in the "Stop Shooting" Response. *Law Enforcement Executive Forum. 9*(4). 35-54.

Lewinski, W. J., Seefeldt, D., Redman, C., Gonin, M., Sargent, S., Dysterheft, J., & Thiem, P. (2016). The Speed of a Prone Subject. *Law Enforcement Executive Forum. 16*(1). 70-83.

Lundin, E. J., Dawes, D. M., Ho, J. D., Ryan, F.J., & Miner, J. R. (2009). 315: Catecholamines in Simulated Arrest Scenarios. *Annals of Emergency Medicine, 54*(3), S98-S99.

MCL § 750.81d(1) *Assaulting, battering, resisting, obstructing, opposing person performing duty; felony; penalty; other violations; consecutive terms; definitions.*

Mesloh, C., Wolf, R., Henych, M., & Thompson, F. (2008). Less Lethal Weapons for Law Enforcement: A Performance-Based Analysis. *Law Enforcement Executive Forum. 8*(1). 133-149.

Nugent, Pam M.S. "Tachypsychia". *PsychologyDictionary.org*. April 13, 2013, https://psychologydictionary.org/tachypsychia/. Accessed by Steve Ashley on May 28, 2018.

Remsberg, C., Adams, R. J., & McTernan, T. M. (1980). *Street Survival: Tactics for Armed Encounters*. Evanston IL: Calibre Press.

Ross, D. L., & Siddle, B. K. (2003). An Analysis of the Effects of Survival Stress in Police Use-of-Force Encounters. *Law Enforcement Executive Forum, 3*(2).

Siddle, B. K. (2005). *PPCT Defensive Tactics Student Manual – Michigan edition*. Belleville IL: PPCT Management Systems

Siddle, B. K. (2004). *PPCT Defensive Tactics Instructor Manual – United States edition*. Belleville IL: PPCT Management Systems.

(2011). *Stress and Decision Making*. Federal Law Enforcement Training Center.

U.S. Const. amend. IV.

Wise, J. (2009). Extreme Fear: *The Science of Your Mind in Danger*. New York: Palgrave.

## TABLE OF CASES

*Bell v. Wolfish,* 441 U.S. 520 (1979).

*Brooks v. City of Seattle,* 599 F.3d 1018 (9 Cir. 2010).

*Brower v. County of Inyo*, 489 U.S. 593, 597 (1989).

*Bryan v. MacPherson,* 630 F.3d 805 (9 Cir. 2010).

*Byther ex rel. Byther v. City of Mobile*, 398 F. Supp. 2d 1222, 1237 (S.D. Ala. 2005)*.*

*Chew v. Gates*, 27 F.3d 1432 (9 Cir. 1994), cert. denied, (U.S. Feb. 21,1995) (No. 94-980).

*Dickerson v. McClellan*, 101 F3d 1151, 1160 (6 Cir. 1996).

*Forrester v. City of San Diego,* 25 F.3d 804 (9 Cir. 1994).

*Garczynski v. Bradshaw*, 573 F.3d. 1158 (11 Cir. 2009).

*Graham v. Connor,* 490 U.S. 386 (1989).

*Harris v. Serpas*, 745 F.3d 767, 773 (2014).

*Illinois v. Rodriguez,* 497 U.S. 177 (1990).

*Jean-Baptiste v. Gutierrez*, 627 F.3d 816 (11 Cir. 2010).

*Kumho Tire Co., et al., v. Carmichael, et al.,* 526 U.S. 137 (1999).

*Long v. Slaton*, 508 F.3d 576, 581 (11 Cir. 2007).

*Penley v. Eslinger*, 605 F.3d 843 (11 Cir. 2010).

*Rockwell v. Brown*, 664 F.3d 985 (5 Cir. 2011).

*Rudlaff v. Gillispie*, 791 F3d 638, 641 (6 Cir. 2015).

*Tennessee v. Garner*, 471 U.S. 1 (1985).

## EXHIBIT II – CURRICULUM VITAE

# STEVEN D. ASHLEY

15 Custer Court
Monroe, Michigan 48161

Voice: 517.548.2275          Cell: 248.467.1541          Facsimile: 734.749.1321
E-Mail: Steve@PoliceRisk.com          Web Site: www.PoliceRisk.com

**Last Reviewed/Updated August 22, 2019**

## SPECIAL QUALIFICATIONS

- 15 Years as a full-time, sworn, law enforcement officer and manager.
- 12 Years as a full-time risk management professional, specializing in law enforcement, criminal justice, security, and corrections risk management.
- Over 40 years as a criminal justice trainer in the areas of high-risk activity, training, and training management.
- Completed over 6,000 hours of law enforcement, emergency management, risk management, and public safety related training.
- Personally delivered over 15,000 hours of training to over 16,500 law enforcement and corrections officers and managers, more than 8,000 hours of which was instructor- or Master-level training.
- Earned and received certification as a Master Use of Force Instructor, Advanced Force Science Specialist, Master Force and Control Instructor, Certified Force Science Analyst, Master Excited Delirium/Agitated Chaotic Event Instructor, and TASER Senior Master Instructor.
- Instructor Graduate of the _Law of Self Defense Instructor Program_, Law of Self Defense Institute.
- 10 years as Police Academy Use of Force/Driver Training Coordinator.
- Earned and received state approval as lead police academy Firearms Instructor.
- Earned and received state approval as lead police academy Driving Instructor.
- Designed and developed many training programs, presentations, and curricula.
- 15 years management experience spanning both the public and private sectors.
- Personally conducted on-site risk management reviews of more than 400 law enforcement agencies and jails in more than seven states, examining all aspects of law enforcement and corrections management, practices, and operations.
- Personal critical reviews of more than 500 law enforcement and corrections Policy and Procedure Manuals, from agencies across the United States.

- Advisory Board Member (§ 1701) for the OSS Academy, a Texas state-licensed education provider, approved by the Texas Commission on Law Enforcement[223] to provide required in-service training as well as other courses.
- Subject Matter Expert for the Michigan Law Enforcement Officers Training Council,[224] in the development of the *Michigan Emergency Vehicle Operations Instructor Manual*.
- Subject Matter Expert and Content Review Specialist for the Michigan Law Enforcement Officers Training Council, in the development of the *Michigan Law Enforcement Driver Training Reference Guide*.
- Subject Matter Expert for the Mississippi Department of Public Safety, Standards and Training Division, in the development of the *Mississippi Detention Officer Course*.
- Subject Matter Expert for the Mississippi Department of Public Safety, Public Safety Planning Division, in the development of the *Mississippi Model Law Enforcement Policies & Procedures* program.
- Subject Matter Expert for the Mississippi Department of Public Safety, Public Safety Planning Division, in the development of the *Mississippi Model Jail Policies & Procedures* program.
- Subject Matter Expert for the Michigan Law Enforcement Officers Training Council, in the development of the *Michigan Law Enforcement Officer-Subject Control Continuum*.
- Subject Matter Expert for the Illuminating Engineering Society of North America, *Security Lighting Committee* and *Security Lighting Committee on Lighting and Crime*.
- Published author and frequent guest lecturer on the subjects of management of high-risk police and corrections activity, use of force, pursuit driving and vehicle operations, law enforcement and corrections procedures and practices, training, training management, risk management, and other public safety related topics.
- Author, columnist, and contributor to criminal justice publications, including Law Officer, PoliceMag.com, Law and Order, Police and Security News, The ASLET Trainer, Law Enforcement Technology, Police Magazine, Answering the Call, The ILEETA Review, The ILEETA Chronicle, and Officer.com.

## FORMAL EDUCATION

| | |
|---|---|
| Associate in Risk Management / Public Entities, Insurance Institute of America | 2000 |
| Master of Liberal Studies in Technology [CJ], Eastern Michigan University | 2000 |
| Associate in Risk Management, Insurance Institute of America | 1991 |
| Master of Science in Criminal Justice [Management], Michigan State University | 1988 |
| School of Police Staff and Command, Northwestern University | 1987 |

---

[223] TCOLE, i.e., the Texas Commission on Law Enforcement, was formerly known as TCLEOSE, i.e., the Texas Commission on Law Enforcement Officer Standards and Education.

[224] Originally known by the initialism MLEOTC; now renamed as the Michigan Commission on Law Enforcement Standards, i.e., MCOLES.

Bachelor of Arts in Communications, Michigan State University      1982

Police Officer Certification, Southeast Regional Criminal Justice Training Center    1976

## CURRENT EMPLOYMENT

### 2013 to Present – Concordia University, Ann Arbor, Michigan

*Adjunct Professor*. Justice & Public Policy, Haab School of Business. Teaching various law enforcement, corrections, criminal justice, risk management, and public policy subjects to undergraduate and graduate students at a traditional, brick-and-mortar university. Actively assist with program and curriculum development.

### 2005 to Present – OSS - Law Enforcement Advisors®, Spring, Texas

*Law Enforcement Advisor*®. Contracted law enforcement advisor and risk manager, providing services, assessments, and consultation to other law enforcement and corrections professionals, adjusters, and legal professionals.

*OSS Academy® - TCOLE Advisory Board Member* of the *OSS Academy*, which is a Texas state-licensed education provider. In addition to serving on the Board, I am an instructor, course developer, and Quality Assurance Specialist. Curriculum includes both instructor-led training and E-learning for law enforcement, corrections, security, telecommunications, and public-sector risk managers.

### 1993 to Present – CIRMAT, Inc., Monroe, Michigan

*Owner*. Specializing in law enforcement and corrections risk management and consulting services, and training of criminal justice trainers and managers. Case consultation services specializing in police and corrections high-risk activity, with primary emphasis in management of force/control, motor vehicle operations, and arrest procedures.

## EMPLOYMENT HISTORY

### 2004 to 2013 – Northrop-Grumman Corporation, Galloway, New Jersey

*Instructional Technologist*. Deliver training on security procedures to transportation security personnel at airports across the United States. Train and certify Screeners in the use of equipment and techniques for screening checked baggage. Certified to train on equipment currently in use by Transportation Security Administration Baggage Screeners.

### 2001 to 2009 – Police Policy Studies Council, Spofford, New Hampshire

*Staff member and co-owner*. Served as a police use of force, motor vehicle operations, and arrest techniques, trainer and consultant. Developed and delivered training programs to police, corrections, and other municipal executives and trainers. Consulted in police use of force cases, police driving, arrest tactics, and general law enforcement procedures.

**1986 to 2008 – Washtenaw Community College, Ann Arbor, Michigan**

*Force management, firearms, use-of-force, and police driving instructor*. Appointed as Police Academy Use of Force/Driver Training Coordinator from 1996 to 2005. Chief Firearms Instructor and Chief Driving Instructor. Responsible for conceptualizing, planning, developing, and delivering, many training programs at both the academy and in-service levels, for police, corrections, security, and Natural Resources officers, including instructor training in various use of force disciplines, as well as police driving.

**2002 to 2003 – AIS, Inc., Renton, Washington**

*Master Instructor*. Last assignment was as a subcontractor with Boeing Corporation, conducting baggage screener training throughout the United States. One of only 35 (out of 1,600) training staff that were transitioned to Boeing from AIS, for the purpose of fulfilling the federal "bridge" contract for baggage screener training.

Initially employed under a U.S. Government contract for the Transportation Security Administration. Certified as one of only 30 BST Master Instructors, with responsibility for training and supervising baggage screeners and baggage screener trainers throughout the United States. Certified to train on screening machines in use by federal transportation security baggage screeners.

**2000 to 2003 – Legal Defense Manual, East Lansing, Michigan**

*Co-Owner* and *Executive Editor*. Responsible for writing articles, as well as editing and publishing a publication which focused on legal and managerial issues in law enforcement and corrections.

**1999 to 2001 – American Risk Pooling Consultants, Inc., Southfield, Michigan**

*Manager of Loss Control Development* and *Director of Law Enforcement Risk Control*. Direct responsibility for management of two company subsidiaries located in Iowa and Ohio, providing direction and supervision to loss control employees. Conducted specialized field loss control assessments of public safety agencies, jails, and other municipal practices and facilities.

**1992 to 2002 – Smith & Wesson Academy, Springfield, Massachusetts**

*Adjunct Faculty*. Develop and present training programs geared toward use of force management skills. Develop curricula and present training in advanced use of force and firearms skills for police, security, and corrections trainers and training managers.

**1991 to 1998 – Meadowbrook Insurance Group, Southfield, Michigan**

*Public Entity Loss Control Manager*. Direct management responsibility for loss control staff members, and coordination of Public Entity oriented loss control programs for insurance coverage pools and individual public and private clients in six states. Planned and structured delivery of services to approximately 50 client corporations, developed and assisted with the presentation of new marketing approaches, assured coordinated communications between internal company units, and with external customers and fellow contractors. Conducted specialized field loss control assessments of municipalities, public safety agencies, and jails. Other

responsibilities included development of service plans and budgeting for multiple programs, coordination of personnel and resources to fulfill diverse client needs, and allocation/utilization of resources.

Formerly, *Director of Law Enforcement Risk Control*. Responsibilities included day-to-day, hands-on management, development of service plans, coordination, budget management, and frequent interaction with both internal company units and clients. Primary responsibility for the design and implementation of a risk control program for approximately 900 law enforcement and corrections agencies in five states. Conducted many on-site risk assessments of public safety agencies, jails, and other municipal facilities and practices.

**1989 to 1991 – Governmental Risk Managers, Inc., Plymouth, Michigan**

*Risk Control Manager*. Direct responsibility for planning, implementation, and delivery of risk control services to two public entity insurance pools that collectively represented approximately 1,200 governmental jurisdictions. Responsibilities included day-to-day hands-on management, development of service plans, budgeting, coordination of service delivery, marketing assistance, assessment of results, and resource allocation. Conducted specialized field loss control assessments of municipalities, public safety agencies, and jails.

Previously served as a *Risk Control Consultant*, specializing in general liability, administration, personnel practices, training, law enforcement and corrections risk management, and program development. Conducted many specialized field loss control assessments of municipalities, public safety agencies, and jails.

**1978 to 1989 – Livingston County Sheriff Department, Howell, Michigan**

Served as road patrol deputy sheriff on all three shifts, and as afternoon shift commander. Final five-year assignment was as *Staff Services Administrator*, with department-wide responsibility for training all law enforcement and corrections staff; community service/crime prevention programs for Michigan's fastest growing county; departmental policy research, development, and implementation; and departmental county-wide emergency management.

**1974 to 1978 – Various police employment as a Patrol Officer and Sergeant,**

at smaller departments, including Fowlerville, Pinckney, Webberville, and Perry, Michigan. My duties included patrol, investigations, training, and supervision of other officers.

## EXPERT CASE CONSULTATION

I have provided expert consultation and review in more than 170 cases since 1994, approximately 75% of which have been defense cases. During the same years, I have testified as an expert – at deposition, hearing, or trial – 47 times in 41 cases, approximately 65% of which have been defense cases.

## MEMBERSHIP ASSOCIATIONS & VOLUNTEER ACTIVITIES

- Alpha Phi Sigma, National Criminal Justice Honor Society

- American Civil Liberties Union – Former Member
- American Jail Association – Former Member
- American MENSA
- American Red Cross – Livingston County Chapter, Board of Directors – Past Member
- American Society of Law Enforcement Trainers (ASLET) – Charter Member (former Region 5 Director, formerly Michigan State Director)
- American Society for Testing and Materials, International (ASTM) – Voting Member
- Concerns of Police Survivors (COPS) – Family/Survivor Member
- Concordia University Criminal Justice Alliance – Faculty Member/Co-Advisor
- Concordia University Justice & Public Policy – Advisory Council
- Concordia University School of Business – Advisory Council
- Illuminating Engineering Society of North America – Professional Member
- International Association of Chiefs of Police (IACP)
- International Association of Correctional Training Personnel (IACTP) – Professional Member
- International Association of Directors of Law Enforcement Standards and Training (IADLEST)
- International Association of Law Enforcement Emergency Vehicle Response Trainers (ALERT)
- International Association of Law Enforcement Firearms Instructors (IALEFI)
- International Foundation for Protection Officers – Former Member
- International Law Enforcement Educators and Trainers Association (ILEETA) – Advisory Board, Managing Editor Emeritus, and Founding Member
- Lakewood Research Training Group – Former Member
- Law Enforcement & Emergency Services Video Association, International (LEVA)
- Michigan Association of Chiefs of Police (MACP) – Active Member
- Michigan Commission on Law Enforcement Standards – Former Member, Training Advisory Committee (Ad-Hoc)
- Michigan News Broadcasters Association – Former Member
- Mississippi Department of Public Safety, Public Safety Planning Division – Subject Matter Expert
- Mississippi Department of Public Safety, Standards & Training Division – Subject Matter Expert
- MSU Alumni Association – Life Member
- National Law Enforcement Academy Resource Network (NLEARN) – Member
- National Rifle Association (NRA) – Benefactor (Life) Member
- Northwestern University Traffic Institute Alumni Association
- OSS Academy – TCOLE Advisory Board Member (§ 1701)

- Phi Kappa Phi Academic Honor Society
- Police Marksman Association – Life Member
- Society for Police and Criminal Psychology – Active Member

## INSTRUCTOR / ARMORER CERTIFICATIONS COMPLETED / EARNED

- Advanced Driving Techniques Instructor, General Motors Corporation
- Advanced Firearms Instructor, Washtenaw Community College
- Advanced Officer Survival Instructor, Washtenaw Community College
- Aerosol Chemical Munitions Instructor, AERKO International
- Aerosol Chemical Weapon Instructor-Trainer, AERKO International
- AXON/Evidence.com Instructor, TASER International
- Baggage Screener Training Master Instructor, Advanced Interactive Systems
- Below 100 Officer Safety Instructor, Law Officer Initiative
- Certified Baggage Screener Trainer, Transportation Security Administration
- Certified Field Training Officer, MLEOTC
- Chemical Agents Decontamination Instructor, National Association of Tactical / Medical Response
- Chemical Munitions Instructor, Smith and Wesson Academy
- Civilian Safety Awareness Program Instructor, SABRE
- Defensive Driving Instructor, National Safety Council
- Defensive Tactics Instructor, PPCT Management Systems
- Driving Instructor, Federal Law Enforcement Training Center
- Emergency Vehicle Operations Instructor – EVO (MLEOTC), Lead Academy Instructor Certified
- Excited Delirium/Agitated Chaotic Event Master Instructor, Institute for the Prevention of In-Custody Deaths
- FATS Instructor Trainer, FATS, Inc.
- Firearms Instructor, Federal Law Enforcement Training Center
- Firearms Instructor, National Rifle Association
- Firearms Instructor / Range Officer, Lansing Community College
- Firearms Instructor (MLEOTC), Academy Instructor Certified
- Firearms Instructor (MLEOTC), Lead Academy Instructor Certified
- Firearms Program Management, Smith and Wesson Academy
- Firearms Retention/Disarming Techniques Instructor, Defensive Tactics Institute
- First Aid Instructor, American Red Cross
- Flashlight Defensive Tactics Instructor, Defensive Tactics Institute
- Glock Armorer, Glock, Inc., Macomb Community College
- Handcuffing & Restraint Techniques Instructor, Defensive Tactics Institute

- Identification, Prevention, Management and Investigation of Sudden and In-Custody Death Instructor [3 awards], Institute for the Prevention of In-Custody Deaths
- Impact Weapons Instructor, PPCT Management Systems
- Interactive Training Instructor, Smith & Wesson Academy
- Kubotan Techniques Instructor, Defensive Tactics Institute
- Law Enforcement Rifle Instructor, Smith & Wesson Academy
- Management of Aggressive Behavior (MOAB) for Public Safety Instructor, PPCI, Inc.
- Metal-Tec 1400 Instructor, Metal-Tec, Inc.
- Michigan Traffic Radar Instructor, Michigan State University
- Mossberg Field Armorer, O.F. Mossberg & Sons, Inc.
- Nationally Certified Instructor – Charter Member (INCI), International Association of Directors of Law Enforcement Standards and Training
- OCAT Aerosol Weapon Instructor-Trainer, National Criminal Justice Training Council
- Officer Survival Instructor, PPCT Management Systems
- Oleoresin Capsicum Law Enforcement and Corrections Instructor, MSI-Mace, Inc.
- Police Narcan Instructor, Gendarme Consulting Group
- Police Drivers' Training Instructor, Saint Publications
- Police Precision Driving Instructor, Macomb Community College
- Police Precision Driving Instructor (MLEOTC), Academy Certified
- Police Pursuit Driving Policy Instructor, National Highway Traffic Safety Administration
- Radiological Monitoring Instructor, Federal Emergency Management Agency
- Re-Creating Stress Instructor, Mission Critical Concepts, LLC
- Refuse to be a Victim® Instructor, National Rifle Association
- Remington Armorer, Remington Arms Co.
- Remington Shotgun Maintenance Armorer, Remington Arms Co. / Washtenaw Community College
- Revolver Armorer, Smith and Wesson Academy
- Sabre OC Aerosol Projector Instructor, Security Equipment Corporation
- Safariland Use of Force Instructor, Safariland Training Group
- Semi-Automatic Pistol Instructor, Smith and Wesson Academy
- Sexual Harassment, Assault, Rape Prevention (SHARP) Instructor, PPCT Management Systems
- Shotgun Instructor, Smith and Wesson Academy
- Sig-Sauer Armorer, SigArms, Inc.
- SkidCar™ System Instructor, SkidCar, Incorporated

- Springfield Armory XD Armorer, Team One Network / Northeast Wisconsin Technical College
- Stinger Instructor, Stinger Systems
- Stinger S-200 Intermediate Instructor, Stinger Systems
- Stop Stick Controlled Tire Deflation Device Instructor, StopTech, Ltd.
- Stop Stick Controlled Tire Deflation Device Instructor-Trainer, StopTech, Ltd.
- Tactical OC Instructor, Defensive Tactics Institute
- TASER Armorer, TASER International
- TASER Electronic Control Device Instructor, TASER International
- TASER Master Instructor, TASER International
- TASER Senior Master Instructor, TASER International
- TASER Technician, TASER International
- Use of Force By-the-Numbers® Instructor, Institute for the Prevention of In-Custody Deaths
- Use of Force Instructor, Michigan Municipal Risk Management Authority
- Use of Force Instructor, National Criminal Justice Training Council
- Wrap Restraint System Instructor, Safe Restraints, Inc.

## CERTIFICATE INSTRUCTOR PROGRAM COMPLETED / EARNED

- Law of Self Defense Instructor Program, Law of Self Defense Institute

## CAREER CERTIFICATIONS COMPLETED / EARNED

- Advanced Force Science Specialist, Force Science Institute
- Advanced Police Officer Training Certification [4 awards], Michigan Law Enforcement Officers Training Council (now MCOLES)
- Associate in Risk Management, Insurance Institute of America
- Associate in Risk Management for Public Entities, Insurance Institute of America
- Certified Breathalyzer Operator, Michigan State Police
- Certified Force Science Analyst, Force Science Institute
- Certified Law Enforcement Instructor, Arkansas Commission on Law Enforcement Standards and Training
- Certified Litigation Specialist [2 awards], Americans for Effective Law Enforcement (AELE)
- Certified TASER Technician/Armorer, TASER International
- Emergency Medical Technician, State of Michigan
- Evidence Collection and Analysis, AXON Enterprise
- Excited Delirium/Agitated Chaotic Event Master Instructor, Institute for the Prevention of In-Custody Deaths

- IADLEST Nationally Certified Instructor – Charter Member (INCI), International Association of Directors of Law Enforcement Standards and Training
- Master Force & Control Instructor, Smith & Wesson Academy
- Master Use of Force Instructor, Police Policy Studies Council
- OSHA Compliance Assurance Certification
- Police Management Development Certification [3 awards], Michigan Law Enforcement Officers Training Council (now MCOLES)
- Police Officer Certification, Michigan Law Enforcement Officers Training Council (now MCOLES)
- Police Supervisor Development Certification, Michigan Law Enforcement Officers Training Council (now MCOLES)
- Qualified Accident & Illness Prevention Service Provider, Commonwealth of Pennsylvania, Bureau of Worker's Compensation
- TASER Senior Master Instructor, TASER International (now AXON)
- Texas Loss Control Representative, Texas Department of Insurance

## AWARDS AND RECOGNITION

- Citation for Bravery, Pinckney Police Department
- Life Saving Citation, Livingston County Sheriff Department
- Outstanding Academic Achievement – 1998, Eastern Michigan University
- Outstanding Academic Achievement – 1999, Eastern Michigan University
- Most Competent Instructor – Corrections Officers Academy, Washtenaw Community College

## PUBLICATIONS (IN THE PAST TEN YEARS)

Risk Management for Trainers: A Continuing Series on Applied Risk Reduction, The ILEETA Chronicle, Volume 4, Number 1, December, 2009

No Money is No Excuse: Cutting Training Budgets Due to Lack of Funding is No Excuse, Officer.com Online Magazine, February, 2009

Weapons, Weapons Everywhere: The World is Full of Weapons, So Choose Wisely, Officer.com Online Magazine, February, 2009

Watch Your Mouth! Someone Might Make You Eat Your Words, Officer.com Online Magazine, January, 2009

Your Pen is Trying to Kill You, Officer.com Online Magazine, January, 2009

Avoid PowerPointlessness: From Preparation through Delivery, The ILEETA Chronicle, Volume 3, Number 1, December, 2008

Officer Down! Thankfully We're Hearing that Less, Officer.com Online Magazine, December, 2008

Risk Management for Trainers: A Continuing Series on Applied Risk Reduction, The ILEETA Chronicle, Volume 3, Number 1, December, 2008

Resistance is Futile, Officer.com Online Magazine, December, 2008

Training: How Much is Enough? Officer.com Online Magazine, November, 2008

Write Your Report! Officer.com Online Magazine, November, 2008

Explain it to me Like I'm a Six-Year Old, Officer.com Online Magazine, October, 2008

Stay Alert for Falsehoods: A Little Knowledge is a Dangerous Thing, Officer.com Online Magazine, September, 2008

TASER C2 – Go Prepared in Style, New American Truth, September, 2008

We've Got a Real Problem in Police Work, Officer.com Online Magazine, August, 2008

Duty Gear is Good – Except When It's Not, Officer.com Online Magazine, August, 2008

When Bad Things Happen to Good Agencies: Risk Management = More than Just Training and Policies, Officer.com Online Magazine, July, 2008

Not Training is Dumb: You Have to Train, or You're Gonna' get Hurt! Officer.com Online Magazine, June, 2008

The Customers are Always Right, Even When They're Wrong, PoliceMag.com Training Channel, June, 2008

Technology is a Double-Edged Sword, Officer.com Online Magazine, June, 2008

Familiarity Breeds Complacency, Officer.com Online Magazine, May, 2008

The Technology Crutch, Officer.com Online Magazine, May, 2008

The Meaning of Training Certification, PoliceMag.com Training Channel, April, 2008

Don't Stick Your Head in the Sand: It's Called Risk Management for a Reason, Officer.com Online Magazine, April, 2008

Teach with Less Talk, More Action, PoliceMag.com Training Channel, April, 2008

Combined Skills Training, PoliceMag.com Training Channel, April, 2008

What a Great Idea! Officer.com Online Magazine, April, 2008

Work Safer, Get Sued Less! PoliceMag.com Training Channel, March, 2008

Get Off the Couch – Join ILEETA! Officer.com Online Magazine, March, 2008

Where Trainers Go to be Trained, PoliceMag.com Training Channel, March, 2008

Training Videos are Great – When They Work, Officer.com Online Magazine, March, 2008

What is a Trainer? PoliceMag.com Training Channel, February, 2008

Train More? Train Less? Officer.com Online Magazine, February, 2008

Danny, We Hardly Knew Ye, The ILEETA Review, February, 2008

Solving Problems with PowerPoint and Video, PoliceMag.com Training Channel, February, 2008

What's Wrong with Using Electronic Control Devices? Officer.com Online Magazine, February, 2008

Projector Blues, PoliceMag.com Training Channel, February, 2008

Policies are NOT Rules, Officer.com Online Magazine, January, 2008

Why We Don't Need Firearms Instructors, PoliceMag.com Training Channel, January, 2008

Aerosol Spray Weapon Refresher, Officer.com Online Magazine, January, 2008

*SWAT & EOD Tactical Vehicle*, Tactical Weapons, January, 2008

## GUEST LECTURER

*After Using Force, Now What? Surviving the Onslaught*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2019

*Protecting the Protectors Instructor Course*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2018

*Protecting the Protectors: The Role of the Trainer*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2017

*Survive & Succeed: Saving Your Officers and Your Department*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2015

*Stay Safe: It's Time to Sweat the Small Stuff*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2014

*Post-Traumatic Stress Disorder in Criminal Justice*, CMI 2013 Client Education Day, November, 2013

*Protect Your People: Because Nobody Else Will*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2013

*TASERs and the Law*, National Rifle Association – Michigan Consumer Weekend, February, 2013

*Keep Your People Safe: On the Street, In the Jail, and In Court*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2012

*Managing the Risks of Interjurisdictional Police Pursuits*, Richmond Regional Multijurisdictional Pursuit Project, Policy Training Symposium, September, 2011

*Using Force: Words and Plans and Goals, Oh My!* The 2011 Use of Force Summit, The Performance Institute, July, 2011

*Force Continuums, Training Priorities, and Smart Use of Force*, The 2011 Use of Force Summit, The Performance Institute, July, 2011

*TASER, TASER, TASER!* The 2011 Use of Force Summit, The Performance Institute, July, 2011

*Avoiding and Managing Arrest-Related Deaths*, The 2011 Use of Force Summit, The Performance Institute, July, 2011

*TASER Download & Data Collection Practices*, 2011 TASER Master Instructor School, TASER International, June, 2011

*Police Use of Force: TASERs and Other Options*, Bancorp South Municipal Insurance Risk Control Program, Gulfport, Mississippi, May, 2011

*Smart Use of Force: In the Jail and On the Street*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2011

*Defining Use of Force for Law Enforcement Professionals*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Current Shifts in the use of Use of Force Continuums*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Arrest-Related Death and the Use of Force*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Considerations for TASERs and Other Non-Lethal Devices*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Addressing Allegations of Police Misconduct*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Smart Use of Force*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2010

*Defining Use of Force for Law Enforcement Professionals*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*The Ramifications of In-Custody Death After the Use of Force*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*The Great Debate: TASERs and Other Non-Lethal Devices – Are They Helping or Hurting?* The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*Examining the Current Usage of, and Shifts in, the Use of Force Model*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*Evidence.com, AXON, and TASER Download & Data Collection Practices*, 2009 TASER Master Instructor School, TASER International, July, 2009

*Live Long and Prosper: The Trainer as Risk Manager*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2009

*Liability in the Use of Force*, The 2008 National Summit on Use of Force in Law Enforcement, The Performance Institute, August, 2008

*TASER's and Other "Less Lethal" Options*, The 2008 National Summit on Use of Force in Law Enforcement, The Performance Institute, August, 2008

*Defining Use of Force*, The 2008 National Summit on Use of Force in Law Enforcement, The Performance Institute, August, 2008

*TASER Download & Data Collection Practices*, 2008 TASER Master Instructor School, TASER International, June, 2008

*Work Safer – Get Sued Less: Managing High Risk Activity*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2008

*Managing the Risks of Non-Deadly Force*, Detroit Police Department, Command & Legal Lecture Series, City of Detroit Law Department, March, 2008

*Assessing and Managing the Risk of Less Lethal Options*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, November, 2007

*TASER Usage – Risks & Rewards*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, November, 2007

*Defining Force for Ourselves*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, November, 2007

*Work Safer – Get Sued Less!* 2007 Michigan NAFTO Conference, National Association of Field Training Officers, October, 2007

*Risk Management: Avoiding "Self-Inflicted Wounds"*, 2007 TASER International Conference, TASER International, July, 2007

*PowerPoint for the Law Enforcement Trainer*, 2007 TASER Master Instructor School, TASER International, July, 2007

*TASER Usage – Risks & Rewards*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, May, 2007

*Defining Force for Ourselves*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, May, 2007

*Enhancing Safety & Reducing Liability: The Trainer is the Key*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2007

*Motor Vehicle Pursuits: High Risk Issues for Trainers*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2006

*Enhancing Safety & Reducing Liability: The Role of the Trainer*, American Society of Law Enforcement Trainers, 19th Annual International Training Conference, January, 2006

*How to Set Up Your Own Website*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2005

*Get on the Web!! Set Up Your Own Trainer's Website*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2004

*Managing Police Pursuit Risk*, Richmond Regional Multijurisdictional Pursuit Project, Training Symposium, December, 2003

*Managing the Risks of Pursuit: Reducing Liability and the Potential for Officer Injuries*, Association of Professional Law Enforcement Emergency Vehicle Response Trainers (ALERT, International), Annual Training Conference, September, 2003

*Dealing with High Risk Activity: Keeping Officers Safer While Reducing Liability*, National Criminal Justice Training Council Annual Conference, April, 2003

*Risk Management and Civil Liability*, Kellogg Community College, October, 2002

*Protecting Officers in High Risk Situations: Enhancing Safety and Reducing Liability*, Wyoming Chiefs and Sheriffs Association, April, 2001

*Protecting Officers in High Risk Situations: The Role of the Trainer in Enhancing Safety and Reducing Liability*, American Society of Law Enforcement Trainers, 14th Annual International Training Conference, January, 2001

*Managing High Risk Emergency Services Activity,* Iowa League of Cities/ICAP, Annual Training Conference, June, 2000

*Managing High Risk Law Enforcement Activity: Use of Force, Pursuit, and Officer Safety*, American Society of Law Enforcement Trainers, 13th Annual International Training Conference, January, 2000

*Managing the Risks of Volunteers,* Public Risk Management Association (PRIMA), Annual Training Conference, June, 1999

*Force & Control: Risk Management Issues for Instructors*, American Society of Law Enforcement Trainers, 12th Annual International Training Conference, January, 1999

*Civil Liability for Emergency Telecommunicators*, Association of Public Safety Communication Officers - Michigan Chapter, Fall Training Conference, September, 1998

*Supplemental Police Manpower: Necessary Evil or True Benefit?* Public Risk Management Association (PRIMA), Annual Training Conference, June, 1998

*Law Enforcement Training: A Systematic Approach*, Public Risk Management Association (PRIMA), Annual Training Conference, June, 1998

*Managing Risk in the Municipal Arena*, 1998 Michigan Municipal Clerks Institute, East Lansing, Michigan, April, 1998

*Getting a Grip: The Management of High Risk Police Activities*, Michigan Association of Chiefs of Police, Winter Training Conference, February, 1998

*Managing Force: Enhancing Safety & Reducing Risk*, American Society of Law Enforcement Trainers, 11th Annual International Training Conference, January, 1998

*Law Enforcement Use of Force in the 21st Century*, Illinois Risk Management Association, November, 1997

*Use of Force: Managing Risk & Safety*, PPCT Management Systems International Training Conference, August, 1997

*Use of Force Management: Special Issues for Managers*, Oklahoma Department of Corrections, July, 1997

*Control Challenges in the School Environment*, Central Michigan University, Law Enforcement & School Liaison Program Institute, June, 1997

*Managing High Risk Law Enforcement Activity*, Michigan Association of Chiefs of Police, Summer Training Conference, June, 1997

*Law Enforcement Post Incident Damage Control*, Public Risk Management Association (PRIMA), Annual Training Conference, May, 1997

*Pursuit Management: Implementing a Control Continuum*, American Society of Law Enforcement Trainers, 10th Annual International Training Conference, January, 1997

*Instructor Challenges in Use of Force Management*, American Society of Law Enforcement Trainers, 10th Annual International Training Conference, January, 1997

*The Risks of Crossing the Border: Managing Interjurisdictional Exposures*, Public Risk Management Association (PRIMA), Annual Training Conference, June, 1996

*Aerosol Weapons: Reducing Your Risks*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1996

*Pursuit Management: Implementing a Control Continuum*, American Society of Law Enforcement Trainers, 9th Annual International Training Conference, January, 1996

*Critical Incident Policy Management*, Minnesota Sheriff's Association Training Conference, December, 1995

*Use of Force Management for Supervisors*, Upper Peninsula Law Enforcement Development Center, November, 1995

*Vehicle Operations Management*, International Association of Chiefs of Police Training Conference, October, 1995

*Total Control Management*, PPCT Management Systems International Training Conference, August, 1995

*Police Administration and Risk Control*, Ohio Municipal League Joint Self Insurance Pool, Annual Training Conference, June, 1995

*Effective Risk Manager/Law Enforcement Executive Relationships*, Public Risk Management Association (PRIMA), Annual Training Conference, June, 1995

*Pursuit Management: Implementing a Control Continuum*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1995

*Managing the Use of Force*, American Society of Law Enforcement Trainers, 8th Annual International Training Conference, January, 1995

*Fundamentals of Risk Management*, Wyoming Chiefs and Sheriffs Annual Conference, Wyoming Law Enforcement Academy, April, 1994

*Implementing Defensible Control Continuums*, Law Enforcement Officers Regional Training Consortium, Flint, Michigan, March, 1994

*Deadly Force: The Importance of Management*, Northern Michigan Law Enforcement Training Consortium, March, 1994

*Interjurisdictional Liability*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1994

*Risk Control: Managing the Use of Force*, American Society of Law Enforcement Trainers, 7th Annual International Training Conference, January, 1994

*Managing Force in a Correctional Setting*, Minnesota Counties Insurance Trust, November, 1993

*Cross-Jurisdictional Liability Issues*, Northern Michigan Association of Chiefs of Police, Annual Meeting, October, 1993

*Managing the Use of Force*, PPCT Management Systems International Training Conference, August, 1993

*Managing Effective Police Training: Doing More with What You Have*, Law Enforcement Officers Regional Training Consortium, May, 1993

*Managing Effective Police Training*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1993

*Contemporary Use of Force Issues*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1992

*Reducing Motor Vehicle Related Losses*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1991

## TRAINING VIDEOS & MULTIMEDIA PRODUCTIONS

*Police Pursuit Driving*, 30-minute video. Performance Dimensions, Inc., Twin Lakes, Wisconsin, 1998.

*Precision Driving Decision System*, 3-part training video. Governmental Risk Managers, 1991.

## BOOK CHAPTER

*Plan to Train or Plan to Fail*, <u>W.I.N. 2: Insights into Training and Leading Warriors</u>, Edited by Brian R. Willis, Warrior Spirit Books, Calgary, Alberta CA, 2009.


| | |
|---|---|
| August 22, 2019 | *Steven D. Ashley* |
| DATE | STEVEN D. ASHLEY, MSc, MLS, ARM/P, AFSS, DSCI |
| | MONROE, MICHIGAN |

# EXHIBIT III – PRIOR TESTIMONY

Last Reviewed/Updated August 22, 2019

## LAW ENFORCEMENT & CRIMINAL COURTS

During 15 years of active duty law enforcement service, I offered testimony, depositions, and affidavits, in State District Courts, State Circuit Courts, State Probate and Juvenile Courts, and various other Hearings and Tribunals, in cases too numerous to list.

## EXPERT COURT TESTIMONY (WITHIN THE PAST FOUR YEARS)

While I have provided expert consultation and review in more than 170 cases, I have testified and/or been deposed 47 times in 41 cases since 1994. The following are cases in which I have testified at deposition, hearing, or trial, in the past four years.

2019 – Cassandra Luster, individually, and A/N/F of _____ a minor child, Damon Luster, Desmond Luster, Jr.; Beverly Diana Luster, individually, and as Administrator of the Estate of Desmond Luster, Sr., Plaintiffs, v. The City of Dallas, et al., Defendants. United States District Court for the Northern District of Texas, Dallas Division. Civil Action Number 3:16-cv-00396-B. I testified at trial as an expert witness on behalf of the Defendants. This was a police excessive use of force/deadly force case.

2018 – Syndel Kabchef, Plaintiff, v. Pickens County Sheriff Donnie Craig, Individually and in his capacity as Sheriff of Pickens County and Deputy Sheriff Rick Hales, individually and in his official capacity as a Pickens County Deputy Sheriff, Defendants, Quik Trip Corporation, Defendant by Counterclaim. Superior Court of Pickens County, State of Georgia. Civil Action File Number 2017 SUCV 76. I was deposed as an expert witness on behalf of the Defendant Quik Trip Corporation and the Plaintiff, Syndel Kabchef. This was a police emergency vehicle operations/collision case.

2018 – Cassandra Luster, individually, and A/N/F of _____ a minor child, Damon Luster, Desmond Luster, Jr.; Beverly Diana Luster, individually, and as Administrator of the Estate of Desmond Luster, Sr., Plaintiffs, v. The City of Dallas, et al., Defendants. United States District Court for the Northern District of Texas, Dallas Division. Civil Action Number 3:16-cv-00396-B. I was deposed as an expert witness on behalf of the Defendants. This was a police excessive use of force/deadly force case.

2018 – Christopher Cantu, as the Administrator of the Estate of Robert Earl Lawrence, Plaintiff, v. City of Dothan, Alabama, Greg Benton, Chris Summerlin, and Adrianne Woodruff, Defendants. United States District Court for the Middle District of Alabama, Southern Division. Case Number 1:16-cv-01003-MHT. I was deposed as an expert witness on behalf of the Defendants. This was a police excessive use of force/deadly force case.

2017 – Collette L. Flanagan, individually, and on behalf of the Estate of Clinton Allen, Deceased; and Ronderaline S. Allen, individually, Plaintiffs, v. The City of

Dallas, Texas; and Clark Staller, Defendants. United States District Court for the Northern District of Texas, Dallas Division. Case Number 3:13-cv-04231-M. I testified at trial as an expert witness on behalf of the defense. This was a police excessive use of force/deadly force case.

2017 – A.M., A Minor, by his parents and natural guardians, Audley Muschette and Judith Muschette, Plaintiff, v. American School for the Deaf, Town of West Hartford, Paul W. Gionfriddo in his individual and official capacities, Chris Hammond in his individual and official capacities, Elwin Espinoza in his individual and official capacities, Defendants. United States District Court for the District of Connecticut. Case Number 3:13-cv-01337-WWE. I was deposed as an expert witness on behalf of the Plaintiff. This was a police excessive use of force/police practices case.

2016 – Collette L. Flanagan, individually, and on behalf of the Estate of Clinton Allen, Deceased; and Ronderaline S. Allen, individually, Plaintiffs, v. The City of Dallas, Texas; and Clark Staller, Defendants. United States District Court for the Northern District of Texas, Dallas Division. Case Number 3:13-cv-04231-M. I was deposed as an expert witness on behalf of the defense. This was a police excessive use of force/deadly force case.

2016 – Lameco M. Williams, Plaintiff, v. City of Birmingham, a Municipal Corporation; Nathan Elmore, an individual; Jeffrey Sanders, an individual; Ashley Knighten, an individual; Jacob McDonald, an individual; Lane Harper, an individual; Arthur Wilder, an individual; Christopher Hayes, an individual; Curtis Mitchell, an individual; Cedric Stevens, an individual; A.C. Roper, an individual, Defendants. United States District Court for the Northern District of Alabama, Southern Division. Case Number 2:15-cv-00949-AKK. I was deposed as an expert witness on behalf of the defense. This was a police excessive use of force case.

2015 – Cris Christenson, Plaintiff, v. City of Joplin, Missouri; Corporal Shawn Dodson; Officer Steven Feken; Officer John Watkins; Freeman Health System; Defendants. United States District Court for the Western District of Missouri. Case Number 3:13-cv-05073-DPR. I was deposed as an expert witness on behalf of the Plaintiff. This was a police false arrest/excessive use of force case.

2015 – City of Romulus / Michigan Police Officers Labor Council (POLC) – Turner Discipline. Unknown Case Number. A Labor Arbitration Hearing. I testified as an expert witness on behalf of the City of Romulus (Michigan) against a Romulus (Michigan) Police Officer who was demoted and accused of excessive force in a police TASER case.

2015 – Katherine Thomas, individually, and as the administrator of the estate of Christopher Jerome Thomas; Plaintiff, v. Darren Moody, in his individual capacity; and City of Dothan, Alabama; Defendants. United States District Court for the Middle District of Alabama, Southern Division. Case Number 1:13-cv-920-WHA-SRW. I was deposed as an expert witness on behalf of the Defendant. This was a police pursuit/shooting/excessive use of force case.

2015 – Kelvion Walker, Plaintiff, v. Amy Wilburn, Defendant. United States District Court for the Northern District of Texas, Dallas Division. Civil Action Number 3:13-cv-04896-D. I was deposed as an expert witness on behalf of the Defendant. This was a police shooting/excessive use of force case.


    August 22, 2019

              Date                            STEVEN D. ASHLEY, MSc, MLS, ARM/P, AFSS, INCI

                                         MONROE, MICHIGAN

# EXHIBIT IV – FEE SCHEDULE

**Last Reviewed/Updated August 22, 2019**

## ALL AMOUNTS ARE IN ADDITION TO EXPENSES

| | |
|---|---|
| Initial Telephone Consultation | No Charge |
| Advance Retainer (Non-Refundable, Billed Against on Hourly Basis) | Waived/Billed |
| Review of Records and Analysis | $150/hour |
| Preparation of Report, Including Research | $150/hour |
| Meetings with Counsel, Site Visits, etc. | $150/hour |
| Deposition (minimum of 6 hours per day) | $200/hour |
| Trial or Hearing (minimum of 6 hours per day) | $200/hour |
| Travel Time, Portal to Portal (maximum of 12 hours per day) | $75/hour |
| Expedite Fee (requested with 7 to 14-day notice) | $500.00 |
| Expedite Fee (requested with less than 7 days' notice) | $1,000.00 |
| Cancellation of Deposition/Hearing/Trial – 7 days or less notice | $1,500.00 |
| Cancellation of Deposition/Hearing/Trial – 8 to 14-day notice | $1,000.00 |
| Cancellation of Deposition/Hearing/Trial – more than 14 days' notice | No Charge |

**PLEASE NOTE:**

Should you engage my services, I will provide services to you as an independent professional. Payment to me for the services I provide is not dependent upon my findings, or upon the outcome of any legal action, mediation, or arbitration; or the amount or terms of any settlement of the underlying legal cause, nor upon any contractual arrangement or other agreement between plaintiff and/or defense counsel and any other person or party.

You may not identify me as either a testifying or non-testifying expert until such time as any engagement fee has been paid or specific arrangements have been made and agreed to – in writing – by me.

All amounts (including any retainer) are in addition to expenses, which include those items that are customary, including – but not limited to – business class airfare, hotel, rental vehicle (full-size), meals, parking fees, and mileage (at the current IRS rate).

Should you engage my services, my relationship is with you. You are responsible for all payments as outlined in this Fee Schedule, regardless of any arrangement you may have with any party or parties you represent, including deposition fees originating from opposing counsel. If engaged, I will issue bills on a monthly basis, or whatever other interval I deem appropriate. Bills are due on receipt, and shall be considered delinquent if unpaid more than thirty (30) days after their date of issuance. Interest shall accrue to any delinquent balance at the maximum rate permitted by law, not to exceed 1.5 per cent per month.

| | |
|---|---|
| August 22, 2019 | *Steven D. Ashley* |
| DATE | STEVEN D. ASHLEY, MSC, MLS, ARM/P, AFSS/INCI |
| | MONROE, MICHIGAN |